WEIHERT and others, Appellants, vs. PICCIONE, Respondent.
[Three cases.]

*September 12—October 9, 1956.*

---

[1] Sec. 320.01 (4), Stats.

For the appellants there was a brief by *Fisher & Fisher* of Janesville, and oral argument by *Cleland P. Fisher*.

For the respondent there was a brief by *Jeffris, Mouat, Oestreich, Wood & Cunningham,* and oral argument by *Louis D. Gage, Jr.,* all of Janesville.

STEINLE, J.   The learned trial court granted the defendant's motions for nonsuit on the ground that sufficient evidence had not been introduced at the trial to support the averments of the complaints.  The challenge here is to such ruling.

A motion for a nonsuit is equivalent to a demurrer to the evidence.  In passing upon such motion, it is incumbent upon the court to view the evidence in a light most favorable to the plaintiff, and the court must give the plaintiff the benefit of the most favorable inferences that can reasonably be deduced therefrom.  *Lake Mills v. Veldhuizen* (1953), 263 Wis. 49, 56 N. W. (2d) 491.

The evidence of record, most favorable to the contention of the appellants, is as follows: The defendant, Frank Piccione, owned and operated a restaurant in the industrial section of Janesville which was open for business twenty-four hours a day.  The premises consisted principally of a counter room with 12 stools for patrons, a main dining room seating

about 24 people, and a kitchen. Intoxicants were not sold in the establishment. No guard was employed there. The plaintiff, Eleanor Weihert, had been employed as a waitress at the defendant's restaurant for a period of six weeks previous to October 16, 1953. She had worked on October 16, 1953, from 11:30 a. m., until 7:30 p. m., and later that night while at home, suggested to her husband, the plaintiff Lawrence Weihert, and to some guests who were visiting at her home,—Mr. and Mrs. Jesse Wells (sister and brother-in-law) and the plaintiff, Donald Tischer (an acquaintance),— that they all go to the defendant's restaurant and have some chicken. The group left the Weihert home for the restaurant, but before arriving there, drove to a tavern outside of the city where they each had a bottle of beer just before closing time. At the restaurant they took seats at a table near the center of the dining room. The restaurant was quite well filled with people. Another man and woman joined the Weihert party at their table. One John Powers was in a group of four (two men and two women) seated at a table next to where the Weihert party sat. Events occurring at the restaurant thereafter were described by Eleanor Weihert in her testimony as follows:

"I noticed nothing about the people who were in there at the adjoining table east of us which was occupied by Mr. Powers and his group. They were talking loud. I wasn't really paying any attention to it because I was talking. We had been seated at our table for about ten minutes when the waitress came to take our order—perhaps it was longer, possibly less. I was not conscious of any talking at the Powers table during this period of time until Powers grabbed Mr. Tischer. Prior to the time that Powers grabbed Tischer I was engaged in conversation with Mrs. Sowles. When Powers started talking so loud and grabbed Tischer I turned to look, and that is when it started—when he started. I observed Powers beating Tischer's head against the board and hitting him in the head. Before Powers grabbed Tischer I did not hear any conversation from anybody of the party

directed to Powers telling him to quiet down. We had been seated for approximately ten minutes before Powers grabbed Tischer—a little more or less. It was probably five or ten minutes before the waitress came around to take the order. After she took the order I saw her go into the kitchen. I don't know how much time passed between the time that the waitress left the table and went into the kitchen and the time when Powers grabbed Tischer by the neck. About five or ten minutes passed between the time that the waitress left and the time that the fracas occurred. I saw Powers hit Tischer at least three or four times. Tischer was going down on his knees onto the floor at the time. Powers was standing. Powers was hitting Tischer in the head with his fist. I don't know what other places he hit or how the blows were going, because the only thing I was trying to do was to get away. Mr. Piccione did not come to Tischer's aid. Someone had hold of my hand over my wrist. I don't know how I got loose—I must have pulled loose. Mr. Tischer had hold of me. I went out to the counter room. I observed Piccione frying hamburgers. I did not talk to Piccione until after Tischer was taken out of the place. I left the restaurant and went down town and called the police who came back with me. I pointed Powers out to the police and they talked to him. I told Piccione's wife and Otto Probst that 'my arm hurts.' I hurt my arm."

· Mrs. Weihert also testified that she had observed a disturbance in the restaurant on a previous occasion when there was an altercation between some truck drivers. She said it was just a scuffle and was over just as quickly as it started. She also stated that she witnessed no other fight or altercation excepting small arguments that happen almost everywhere. She also testified that although she did not know John Powers, she had seen him in the restaurant on a previous occasion. At that time she delayed waiting on Powers and his party for the reason that she was serving others. Powers used abusive language, and his group appeared to have been drinking. On that occasion, although Powers departed from the restaurant before Mrs. Weihert left, and she had been advised by another waitress and by

Piccione to wait awhile, nevertheless she was not afraid to go to her car alone, and in fact did so. In her adverse examination Mrs. Weihert testified that the assault by Powers "took her completely by surprise."

The plaintiff, Donald Tischer, in part testified as follows:

"At the restaurant I had a chance to notice the table that was next to mine. Later I learned that it was occupied by John Powers and a group. I noticed him. He was sitting very close to me on the left side. He had a bottle of beer. There was more than one. He was engaging in rather loud conversation—a rough voice. I would say that we had been at our place for about five minutes before the waitress came to take our order. I just wanted to get acquainted with this fellow [Powers] next to me and I said, 'I just got out of the hospital.' He turned around and said, 'I have been there too. What are you going to do about it?' I didn't say a word. He got up and grabbed me by the back of the neck. I tried to get up but he had his chair too close behind me. Two or three minutes passed from the time the waitress left after taking our order and the time that Powers took hold of the back of my neck. Powers had a loud mouth. He was kind of a crabby guy; he was pretty well off; lit up pretty well, flushed in the face, awful red and hot tempered. After he grabbed me by the neck I tried to get off my chair. He grabbed me to hold me. He hit me with his left hand, back of the side of the jaw and neck. He held my neck and I could not turn my head. Then he hit me twice with his right hand and I don't know what happened from there because I was pretty well dopey. He got me one blow below the temple. The second blow hit me in the nose."

In cross-examination the plaintiff, Tischer, testified:

"I turned to this man who was Powers. He had a bunch of beer bottles on the table. He was crabby at that time, that is he sounded crabby. I did not pay attention to him right away. This thing happened very swiftly. I was not prepared at all for it. I had no reason to believe that he was going to touch me. I never thought he would be that kind of a man. I didn't know he was going to do it until he actually hauled

off and started hitting. I never dreamed that I was going to get hit."

Called adversely as a witness at the trial, the defendant, Frank Piccione, testified that:

"I have operated that restaurant for six years. Twice police were called [during that time] for disturbances—once when a fellow went to sleep and could not be awakened—and another time when two buddies were fooling around. I neither sell nor tolerate the consumption of intoxicants in the restaurant. The waitresses have instructions to inform me when any customer carries liquor into the place. There is a sign in the restaurant which states that no liquor is allowed. Whenever I learn of anyone having liquor in the place I order them to take it out. If people who have been drinking come in and behave themselves, they are served. If they bother other customers, or get rowdy, I tell them to behave or I will put them out, or call the police. The waitresses have instructions to notify me of any disturbance.

"On the night of October 16–17 I was cooking at the stove in the kitchen. I could look into a part of the dining room. I know John Powers as a customer by face, but not by name. I did not know whether Powers had a reputation for being violent occasionally, nor that he spent money for drink. I never saw him have a bottle of beer at his table in the restaurant. I did not see Powers come into the restaurant that night, nor did I see Eleanor Weihert and her party come in. I heard no loud talking by John Powers, nor any loud, angry, or abusive language coming from the restaurant. I remember that a waitress came to the kitchen and reported that there was an argument and that I had better go there and take care of it. At that time I was frying hamburgers and chickens. I moved the hamburgers to the side and shut off the fryer so that the chicken would not burn and proceeded to the scene of the trouble. It took me a minute or maybe less to move the hamburgers and turn off the chicken fryer. I neither heard scuffling in the dining room nor saw any. When I reached the dining room there were a group of people standing in the center. I asked 'What is going on here, what is the trouble?' No one, including

Mrs. Weihert, said a word as to what had happened. I suggested that they sit down. I saw no police officer in the restaurant that night nor did any officer speak to me. I do not recall Mrs. Weihert coming to me in September and reporting that John Powers was giving her a bad time and that she did not want to wait on him. On week-end nights I have cleaned up and found evidence of empty beer cans, now and then, when someone tries to be smart and brings it in."

A witness, Otto Probst, testified that he heard loud voices and argumentive talk for about ten minutes from the time when it started until those who were involved left the place. He testified that a minute or two after the argument commenced there was scuffling. He stated that the defendant went into the dining room and that he "ordered them out of the dining room." In cross-examination he testified that "he would not say the number of minutes it took,—it may have been ten minutes from the time it started and the people involved were on the sidewalk." "The argument was a short period of time, it was very quick."

Jesse Wells testified as to the assault by Powers upon Tischer. He stated that he did not see the defendant enter the dining room after the assault. He said that he saw Eleanor Weihert help pick up Tischer, and that Powers threatened to slap Eleanor if she didn't stay out of the affair. He stated that at first Powers shoved Tischer backward over the chair, and that when Tischer got up he was struck again and grabbed Eleanor's arm as he was going down. He said that the latter action was over quick,—that there was scuffling on the floor, but he would not say as to how long it lasted. He stated that he had no reason to think that anybody was going to be hit.

The causes of action involved are based upon well-established principles. While it is the general rule that a restaurateur is not an insurer of a guest or patron against personal injuries inflicted by other persons on the premises, who are

, in no manner connected with the business, Anno. 106 A. L. R. 1003 *et. seq.*, nevertheless the proprietor of a place of business who holds it out to the public for entry for his business purposes (including a restaurant) is subject to liability to members of the public while upon the premises for such a purpose for bodily harm caused to them by the accidental, negligent, or intentionally harmful acts of third persons, if the proprietor by the exercise of reasonable care could have discovered that such acts were being done or were about to be done, and could have protected the members of the public by controlling the conduct of the third persons, or by giving a warning adequate to enable them to avoid harm. Restatement, 2 Torts, p. 953, sec. 348. See also 65 C. J. S., Negligence, p. 533, sec. 44; 28 Am. Jur., Innkeepers, p. 577, sec. 54; and *Hughes v. Coniglio* (1946), 147 Neb. 829, 25 N. W. (2d) 405. Although the standard of care does not change, the degree of care required fluctuates with the facts and circumstances surrounding each particular case. 28 Am. Jur., Innkeepers, p. 577, sec. 54; 65 C. J. S., Negligence, p. 533, sec. 45. The possessor (of such business) in person or by his servants, shall be reasonably diligent and competent in affording such protection when harm is threatened by others; but if the place is one or the character of the business is such that the possessor (of the business property) should expect careless or criminal third persons to be thereon, either generally or at some particular time, he is under a duty to employ a reasonably sufficient number of servants to afford a reasonable protection. In *Emerson v. Riverview Rink & Ballroom* (1940), 233 Wis. 595, 290 N. W. 129, it was held that the evidence did not support an inference that skaters at a roller-skating rink who collided with another patron who was standing in an areaway outside the regular skating area, should have been noticed by the guards of the rink and required to desist from their manner of skating, since it was not shown how long or how fast the couple who caused the

injury had been skating in that area. In *Pfeifer v. Standard Gateway Theater, Inc.* (1951), 259 Wis. 333, 48 N. W. (2d) 505, claim was made against a theater operator for injuries sustained by a boy patron who was struck in the eye at the theater by something that had been thrown or otherwise projected. The evidence indicated that before the arrival of the plaintiff at the theater, other boys had been throwing popcorn boxes and shooting paper wads by means of rubber bands in the theater, and that such conduct persisted during the time that the plaintiff was in the place. It was held that since there was evidence as to how long the conduct of those who threw and shot things had persisted, it was for the jury to determine whether the defendant was negligent with respect to the failure of its attendants to have so controlled the behavior of the boys as to have prevented injury to other patrons.

It was the expressed view of the trial court when analyzing the evidence most favorable to the plaintiffs, that the defendant had no means of ascertaining that the injuries were going to be inflicted, and that it would be unreasonable to charge the defendant, who was in the kitchen, with any anticipation of the action of Powers, since the plaintiff Tischer, who sat next to Powers, did not know that he was going to be hit, and since the plaintiff, Eleanor Weihert, was taken entirely by surprise over the incident which happened so suddenly that no one had time to do anything about it.

The court was also of a mind that the failure to have provided "guards" or "bouncers" in the establishment did not constitute causal negligence, for the reason that had such been provided, it cannot be assumed that they would have prevented the assault which occurred instantly and without warning. In this regard it appears that the court applied the principle laid down in *Emerson v. Riverview Rink & Ballroom, supra,* and heretofore set forth.

The court also pointed out that the evidence did not disclose as to precisely when the waitress reported the trouble to the defendant—whether it was before or after the assault. The court indicated that such reporting by the waitress most likely took place after the assault had occurred, since no one had seemed to anticipate it.

The court perceived no negligence on the part of the defendant in taking time to move the hamburgers and to shut off the fire under the chicken that was being fried, before moving into the dining room to explore the trouble which, as appears, had already terminated when he arrived there.

The loud talking at the Powers table was confined entirely to persons seated at that table, and the plaintiffs were not concerned with it. The evidence portrays the zeal of the defendant in his efforts to prevent customers from drinking intoxicants on his premises. The evidence does not indicate that the assault perpetrated by Powers was attributable to the presence of the beer at the table where he sat. There is no evidence that the defendant or his employees had notice or knowledge that John Powers possessed quarrelsome or violent propensities.

The evidence of only two visits to the restaurant by the police over a period of six years for disturbances as depicted, militates against any suggestion that the establishment was often frequented by careless or criminal persons, a condition, which if it had existed, would have required extraordinary precaution for the benefit of others in the place.

The trial court found that the plaintiffs' evidence, viewed in its most favorable light, failed to establish causal negligence against the defendant. The ruling was correct, and the motions for nonsuit were properly granted.

*By the Court.*—Judgments affirmed.