**COURT OF APPEALS
DECISION
DATED AND FILED**

**April 2, 2026**

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2024AP387**

STATE OF WISCONSIN

Cir. Ct. No. 2017CV1161

IN COURT OF APPEALS
DISTRICT I

---

MARY MICELI-KRUPKA, JOHN B. KRUPKA, JOHN M. KRUPKA AND ANNA M. KRUPKA,

PLAINTIFFS-RESPONDENTS,

HUMANA WISCONSIN HEALTH ORGANIZATION INSURANCE CORPORATION,

SUBROGATED DEFENDANT-RESPONDENT,

V.

PROASSURANCE CASUALTY COMPANY AND CHILDREN'S HOSPITAL OF WISCONSIN, INC.,

DEFENDANTS-APPELLANTS.

---

APPEAL from a judgment of the circuit court for Milwaukee County: KASHOUA KRISTY YANG, Judge. *Affirmed.*

Before White, C.J., Colón, P.J., and Donald, J.

¶1    WHITE, C.J. Proassurance Casualty Company and Children's Hospital of Wisconsin, Inc. (collectively CHW) appeal from the judgment for over $8 million entered in favor of Mary Miceli-Krupka, John B. Krupka, Anna M. Krupka, and John M. Krupka (collectively, the Krupka family) after a jury trial. CHW argues that the judgment should be reversed and liability precluded on public policy grounds. Additionally, CHW asserts that the Krupka family failed to establish that CHW breached its duty of care in the negligence action. We conclude that none of the public policy factors preclude CHW's liability and that there was sufficient evidence of a breach to sustain the jury's verdict. We affirm.

## BACKGROUND

¶2    Although CHW asserts that this judgment should be reversed because it could have a detrimental effect on healthcare overall, the facts before us are narrow and specific. On February 11, 2014, Kendra, a 14-year-old patient at CHW's Diabetes Clinic, was in an appointment with her mother, Vanessa, while her 16-year-old sister, Jade, sat in the waiting room.[1] At the same time, Mary was trying to schedule a follow-up appointment for her 11-year-old son, John Michael, after his appointment at the Diabetes Clinic; her 9-year-old daughter Anna sat nearby. After a short exchange, Jade cursed at Mary and then physically attacked her, causing injuries to her head and face.

¶3    In February 2017, the Krupka family filed an action against CHW alleging negligence and related loss of society and companionship claims for

_____

[1] In the interest of privacy, we employ pseudonyms for the non-parties to this action: the clinic patient, the accused attacker, and their mother. WIS. STAT. RULE 809.86 (2023-24). All references to the Wisconsin Statutes are to the 2023-24 version.

Mary's husband, John, and their children, John Michael and Anna.[2] CHW moved for summary judgment to dismiss all claims, arguing that the Krupka family could not prove ordinary negligence and recovery was precluded on public policy grounds. The circuit court denied summary judgment.[3]

¶4 The case proceeded to a jury trial in October 2023. The Krupka family presented testimony from multiple eyewitnesses of the attack; Alan Butler, an expert in healthcare security; healthcare providers who treated Mary; Mary's husband and friends who knew Mary before and after the attack; and CHW Security Services. We recite from the testimony relevant to the appeal, primarily consisting of the eyewitnesses to the attack, Butler, and CHW security.

¶5 The Krupka family first called as a witness Chandra Broughton, who was at the Diabetes Clinic with her own child and witnessed the attack. Broughton testified that Mary was talking to the receptionist, Mary's children were sitting off to the side, and a young woman (Jade) was sitting behind Mary. Broughton stated there was tension in the air, Mary's son approached Mary and whispered something, and Mary turned to address the young woman behind her, asking "something along the lines of, do we have a problem." Broughton testified that the woman at the reception desk (Lisa Neilsen) addressed the young woman, stating something to the effect of "we talked about this before, knock it off."

---

[2] Although the Krupka family also alleged a violation of the Safe Place statute, they voluntarily dismissed that claim after the summary judgment hearing.

[3] The Honorable Paul Van Grunsven presided over the summary judgment motion. The Honorable David Borowski presided over a motion to compel discovery and an *in camera* review of Kendra and Jade's medical records for relevancy. The Honorable Kashoua Kristy Yang presided over the jury trial and motions after verdict. We refer to all of the judges as the circuit court.

¶6    Broughton testified that Mary and the children were attempting to finish scheduling an appointment and leave, and as Mary walked past the young woman, the young woman said something to Mary and "then called her a fucking bitch." Mary turned to address her and told her that was inappropriate for the setting. The young woman then "started attacking Mary … just started throwing punches, trying to rip out her hair[.]" The attack continued, the young woman "jumped on a children's table, grabbed one of the chairs, and threw it at Mary." Broughton testified that she went to try to help Mary, who had slid to the floor, and someone came from a patient room, grabbed the attacker by her hair, and dragged her out of the clinic. Security and paramedics then arrived.

¶7    Lisa Neilsen, a medical assistant at the Diabetes Clinic testified that she was familiar with Kendra from prior medical appointments, but did not know Jade. Neilsen testified that she was at the reception desk helping Mary set a future appointment. She noticed Mary was upset, and she stood up and told the young woman (Jade) to stop and that her language was not appropriate. Neilsen stated that Mary accepted her suggestion to set up the appointment by phone, Mary and her children walked out the door to the elevator. Then the young woman said something to Mary, Mary came back and shook her finger at the young woman, and the young woman attacked her. Neilsen testified she tried to break up the attack and then ran to the patient room where Kendra was being seen to get Vanessa to stop her daughter. She did not recall if she had training on a flag in the electronic records system about patients who should not be on the property.

¶8    John Michael's testimony about the incident was similar. He testified that he was waiting with his sister, and a young woman, looking very angry, turned around and told him, "I'm going to get you." He was afraid and he told his mother what the young woman said, and the verbal interaction between

Mary and Jade began. He saw Jade strike his mother on the head and attack her; he took his sister's hand and they hid away.

¶9 The Krupka family called Alan Butler as an expert witness; he worked in healthcare security for about 35 years and was the administrative director for public safety and security for a hospital system in Missouri. Butler opined that based on his experience and the healthcare industry's rules, regulations, and resources, CHW and its security department did not follow the "industry guidelines that would have led them to a successful conclusion as it relate[d] to the safety of individuals around this incident."

¶10 In developing his opinion and creating an expert report, Butler reviewed excerpts of medical records from Kendra and Jade, incident reports, and security risk assessments from CHW's security department. He testified about the timeline of disruptive behavior, and CHW's response to it, in the years leading up to the February 2014 attack.

¶11 Butler began with a CHW security incident report arising from Jade visiting the Emergency Department on February 25, 2009, in which Vanessa was unhappy with the care received. Butler testified that the report described the family as demonstrating "aggressive behavior, inappropriate behavior, loud verbiage, inappropriate swearing," with Vanessa "cursing throughout the incident." Vanessa refused to sign the discharge paperwork, instead stealing Jade's chart out of the nurse's hands and leaving. The security incident report notes that "if [Vanessa] returns to CHW, she will be 'flagged' and Security/Sheriff will be notified[.]"

¶12 Butler testified about multiple reports from Kendra's appointments at the Diabetes Clinic. On February 15, 2011, the front desk staff reported

5

Vanessa was angry and verbally abusive toward Kendra in the waiting room, which resulted in meeting with a social worker. On October 29, 2012, Kendra's physical assessment could not be completed because Vanessa and Jade, who accompanied her, were yelling and swearing at the provider. Jade became belligerent and swore at the provider when she was confronted for playing with the exam room phone. The family was informed that Kendra would "be discharged from clinic if [the] family continues to swear at providers" and it was "recommended that [her] sister not attend [Kendra's] clinic visits." On February 13, 2013, Vanessa became very agitated with the doctor's treatment plan for Kendra, and demanded to know who the doctor was and insisted on looking at the doctor's identification, despite an introduction at the beginning.

¶13    Butler also testified about reports of two of Jade's CHW visits. On November 8, 2012, Jade was seen in the Emergency Department for a finger injury; she reported that she received this injury punching her cousin in a fight at school. On February 27, 2013, Jade had a Rheumatology Clinic appointment for recurrent pain. In addition to physical health concerns, the clinic notes included that she felt depressed and she had an evaluation at the Milwaukee County Medical Health Complex after she threatened to hurt others at school.

¶14    Butler then turned to the incident reports from May 2013. On May 8, Vanessa took Kendra to the Emergency Department for care related to her diabetes; Vanessa became upset, yelled profane language, and complained that the medical staff were not admitting Kendra to the hospital because she had "state insurance," and if she had better insurance, Kendra would get better care. Vanessa refused further care for Kendra and attempted to pull Kendra's IV out. The medical staff noted that they felt unsafe, and a copious amount of profane language was directed at them. One doctor noted that Jade was making

inappropriate comments and flirtatious overtures each time the doctor saw them in the room or hallway. The family left the emergency department "AMA" (against medical advice) and without signing any paperwork. Butler opined that the medical staff in the emergency department reporting feeling unsafe was noteworthy because violence in healthcare, particularly in emergency departments, was so common.

¶15 Butler testified that two days later, on May 10, Vanessa and Jade were involved in an incident of "violence, disorderly conduct, and property damage" at the emergency department, when the family again sought care for Kendra. Butler stated that the CHW report described "[t]he family as a whole [being] extremely belligerent" and "[s]ecurity was involved from the time the patient walked in the door." The security risk assessment of the encounter described that staff observed the family knocking on patient doors and screaming foul language. Security responded when one family member shut and barred a door to a patient room in which Kendra was meeting with a nurse for care instructions; the nurse could not exit and the family was laughing as security tried to open the door. After the door was opened, security informed the family it had to leave; the children were yelling and screaming swear words as they walked, "disrupting the entire waiting room and terrifying the children and families" as the family laughed.

¶16 Butler opined that the progression of events showed that the family had been "building up" and also noted that even "the presence of uniformed security" made no difference to Jade or Vanessa. Butler testified that after a security risk assessment, CHW added an electronic flag to "pop[] up every time [Jade, Vanessa, or Kendra] come to the hospital." The record reflects that in Kendra's electronic medical chart, a "safety/security note" was added May 13,

2013, stating "***HIGH RISK***" and that Vanessa and other family have a history of "disorderly, disruptive and violent behaviors (Swearing, yelling, intimidating and threatening) with staff." The note included a Safety Plan listing three steps: (1)"[e]ach time the patient presents- [i]mmediately inform Security Services"; (2) "only the patient's Mom is permitted to accompany the patient to [c]linic [a]ppointments and [emergency department] [v]isits until further notice"; and (3) Security Services was instructed to refer to the "latest Security Risk Assessment on file for direction."

¶17 Butler testified that as part of the risk assessment, CHW reviewed Vanessa's CCAP history, although he noted that deposition testimony from a CHW security manager showed that their CCAP searches only looked for child related crimes, sexual offender registry, or sex abuse.[4] As part of his review, Butler searched Vanessa's CCAP records, based on her birthdate and her fairly unique name, he found 18 separate entries before May 2013, and of those, 11 involved criminal charges. Butler testified that the criminal entries were "very consistent with the behavior they were seeing inside the hospital: [p]roperty destruction, restraining orders … inappropriate behavior." Butler noted that two restraining orders against Vanessa had been granted, barring her from her children's schools.

¶18 Butler testified that the security reports showed that on May 14, 2013, Vanessa met with CHW staff from Security Services, Patient Relations, the

---

[4] "CCAP, which stands for Consolidated Court Automation Programs, makes certain information about circuit court and appellate court cases available to the public." *State v. Debrow*, 2023 WI 54, ¶1 n.2, 408 Wis. 2d 178, 992 N.W.2d 114. Jeremy Phillips, a public safety manager for CHW, testified on behalf of CHW Security Services; he confirmed that CHW's CCAP searches were looking for "child abuse or sex offenses."

Diabetes Clinic, and Social Work to discuss her and her family's conduct on the May 8 and 10 visits. Vanessa was advised that behaviors such as "[v]erbal swearing/cussing; preventing free movement of staff; visitors touching staff without their permission; and grabbing, hitting, or pushing" would not be tolerated. Although CHW developed a behavioral contract, Vanessa was informed she did not have to sign it and she chose not to sign it. Vanessa was also advised that "the behavioral contract would still be in effect and placed in [Kendra's] medical record" whether she signed the contract or not. The contract provided that only Vanessa could accompany Kendra to future visits at CHW. Vanessa was warned that a failure to follow the behavioral contract would result in Vanessa being removed from the property and not allowed back.

¶19    Butler testified that, in contrast, after the attack on Mary, the Safety Plan was updated to require Security Services be notified in advance of Kendra's appointments. Further, Vanessa and Jade were banned from the CHW campus, and the Safety Plan and flags on Kendra's electronic medical record were updated, noting the ban and that security should be called if either were present.

¶20    Butler opined that despite the Safety Plan, behavioral contract language, and in-person meeting, CHW's plan did not have "any teeth." He acknowledged that "[n]o hospital will refuse emergent care"; however, "hospitals can sometimes refuse care inside of their clinics because it's not necessarily life threatening." In this case, Kendra's appointments at the Diabetes Clinic were scheduled, not walk-in and, based on deposition testimony from CHW security staff, the security department was able to access patient medical records and could be alerted about future appointments. Yet, CHW did not exercise that option. He described CHW's approach as expectations, but no follow through. He stated this was a system or process failure, because "there were processes in place to address

this type of behavior" and CHW did not "follow their own process." He considered an outburst or a violent outburst foreseeable and common in healthcare settings. While banning Vanessa and Jade was one way to deal with the safety concerns they posed, he stated that it was not the only option.

¶21    At the close of the Krupka family's evidence, CHW moved to dismiss, arguing that the family had not met their burden to show a breach of the standard of care. The circuit court denied CHW's motion.

¶22    The jury found that CHW was negligent and its negligence was a cause of Mary's injuries. The jury found that Mary was not negligent, but that Vanessa was negligent and her negligence was a cause of Mary's injuries. The jury apportioned negligence as 70% CHW, 30% Vanessa, and 0% Mary. The jury awarded over $7 million to Mary for her past and future pain, suffering, disability, and loss of earning capacity. The jury awarded over $1 million to John, John Michael, and Anna for loss of society and companionship, and severe emotional distress damages for the children for witnessing the attack.[5]

¶23    CHW filed motions after verdict, requesting judgment notwithstanding the verdict, to change certain answers on the verdict pursuant to WIS. STAT. § 805.14(5)(c), or to set aside the verdict and order a new trial. CHW argued that liability for any negligence should be precluded on public policy

---

[5] The jury's award of damages was composed of the following: to Mary: $180,000 for past loss of earning capacity; $1.5 million for past pain, suffering, and disability; $1,530,092 for future health care expenses; $432,000 for future loss of earning capacity; and $3.4 million for future pain, suffering, and disability; to John: $250,000 for loss of consortium; to John Michael: $350,000 for loss of society and companionship; $93,600 for severe emotional distress; and to Anna: $450,000 for loss of society and companionship; and $108,000 for severe emotional distress.

grounds. The circuit court denied all of the motions. As the arguments are similar to the appeal issues, we do not discuss the court's conclusions in detail. The court entered an order of judgment. CHW now appeals.

## DISCUSSION

¶24 On appeal, CHW makes two arguments.[6] First, it asserts that public policy considerations should preclude it from liability for the Krupka family's injuries. "[E]ven if the plaintiff is able to establish a duty of care and the other elements of a negligence claim, the court may nonetheless determine that public policy considerations preclude liability." *Gritzner v. Michael R.*, 2000 WI 68, ¶26, 235 Wis. 2d 781, 611 N.W.2d 906. Second, CHW argues that the Krupka family failed to prove that it breached ordinary care; therefore, the negligence claim itself should be reversed.

### I. Public policy factors

¶25 There are six commonly cited public policy factors that may preclude liability, even if the elements of negligence are proven. *See Tesar v. Anderson*, 2010 WI App 116, ¶13, 329 Wis. 2d 240, 789 N.W.2d 351 (noting that "[t]his list is not exclusive"). The factors include (1) the injury "is too remote from the negligence," (2) the injury "is too wholly out of proportion" to the defendant's culpability, (3) "in retrospect, it appears too highly extraordinary" that the defendant's negligence should have resulted in the harm; (4) "allowing

---

[6] On appeal, CHW does not address all of the motions it raised to the circuit court: motion to dismiss at close of plaintiffs' evidence, directed verdict, judgment notwithstanding the verdict, to change the verdict answers, or for a new trial. We consider these issues abandoned and do not discuss them further.

recovery would place too unreasonable a burden" on the defendant, (5) "allowing recovery would be too likely to open the way for fraudulent claims," or (6) "allowing recovery would enter a field that has no sensible or just stopping point." *Gritzner*, 235 Wis. 2d 781, ¶27. CHW argues that the first, second, third, fourth, and sixth factors apply.

### A. First public policy factor: remoteness

¶26 The first public policy factor looks at whether the injury was too remote from the alleged negligence; it is a restatement of "the old chain of causation test" and "revives the intervening or superseding cause doctrine[.]" *Cefalu v. Continental W. Ins. Co.*, 2005 WI App 187, ¶¶20-21, 285 Wis. 2d 766, 703 N.W.2d 743. CHW argues that the injuries from the February 2014 attack were "too remote" from CHW's negligence because they would not have occurred without intervening or superseding intentional acts by Jade. Further, the injuries were too remote because the last security incident in the record was nine months earlier, in May 2013.

¶27 To understand how the remoteness or chain of causation test would apply, we begin with a case illustration. In *Kidd v. Allaway*, 2011 WI App 161, 338 Wis. 2d 129, 807 N.W.2d 700, parents "lost their teenage daughter in a terrible head-on collision during which she was killed instantly, ejected from the car, landed on the road and was hit and dragged by not one, but two, vehicles." *Id.*, ¶16. The parents sued Allaway, the driver of the second vehicle, under a theory of negligent mutilation, claiming severe emotional distress and resulting physical injury as damages. *Id.* This court concluded that "the death of the Kidds' daughter and the injury caused by the collision, ejection and impact by the first car were all wholly unrelated to Allaway's alleged negligence," which arose

from driving after drinking and driving too fast under the conditions. *Id.*, ¶19. Therefore, the "indirect and broken chain of causation" between the second driver's alleged negligence and the parents' injuries meant that the first public policy consideration would preclude liability—the injuries were too remote. *Id.*, ¶¶16, 19.

¶28 When we consider the entire sequence of events between CHW's alleged negligence and the Krupka family's injuries, we conclude that the chain of causation is unbroken. CHW's negligence arises from foreseeing harm from Vanessa and Jade's disruptive behavior, developing safety and security plans to manage that risk, and then not following through with actions a reasonable clinic or healthcare system would take. Unlike the second driver in *Kidd*, whose negligence was an intervening cause because it occurred after the initial car accident and the first dragging, Jade's actions were not an intervening cause to CHW's negligence.

¶29 CHW argues that Jade's attack was not in the line of causation because it was fundamentally different than the previous disruptive behavior exhibited in the security reports. It asserts that Jade had been inappropriate, but not violent, which challenges the foreseeability of this harm. The foreseeability test does not ask whether the allegedly negligent person could predict the exact injury and damages. *Morden v. Continental AG*, 2000 WI 51, ¶47, 235 Wis. 2d 325, 611 N.W.2d 659. "[I]t is sufficient to show that 'some injury could reasonably have been foreseen.'" *Id.* (citation omitted).

¶30 Further, we reject CHW's attempt to characterize the foreseeable risk as inappropriate and verbal, not violent and physical. While there is no record that Kendra's family physically assaulted anyone on previous visits, CHW's

13

security risk assessment led to the electronic "HIGH RISK" flag that the family had a history of "disorderly, disruptive and violent behaviors (Swearing, yelling, intimidating and threatening) with staff." In the behavioral contract meeting, Vanessa was warned by CHW Security Services not only about a prohibition on verbal disruptions, but she was informed that preventing the free movement of staff, touching staff, "grabbing, hitting, or pushing" would not be tolerated. CHW's security incident reports described foreseeable risks that included physical violence. Therefore, we do not consider Mary's injuries too remote on the basis that the conduct was different.

¶31 CHW also argues that the February 2014 attack was too remote because the last security incident in the record was nine months earlier, in May 2013. We disagree. Butler's testimony on the placement of the "HIGH RISK" electronic flag in Kendra's electronic medical chart after the disruptions in May 2013 was not disputed. There is no evidence that the Safety Plan and behavioral contract created by CHW were withdrawn or changed. With a safety concern continuously documented in the record, there is no break in the chain of causation from the risk of foreseeable harm CHW recognized in 2013 until the attack.

¶32 CHW argues that Wisconsin courts have found mere hours from negligence too remote to hold a defendant liable. In *Conroy v. Marquette Univ.*, 220 Wis. 2d 81, 582 N.W.2d 126 (Ct. App. 1998), Conroy, a student employed by university housing, was assigned to oversee dormitory checkout for an expelled student required to leave housing. *Id.* at 84-85. The student refused to cooperate, displayed a steak knife, and threatened Conroy, who notified her supervisor. *Id.* at 85. The next night, at an off-campus nightclub, Conroy saw the expelled student, who then brutally attacked her with a broken bottle after they both left the club, resulting in facial injuries. *Id.*

¶33 Conroy alleged the university was negligent for directing her to check out the student without informing her of the basis of expulsion—"belligerent, although not physically assaultive or threatening, behavior," and then permitting her to continue the checkout after the student became uncooperative. *Id.* at 90-91. Although the jury in *Conroy* found the university negligent, this court concluded that the injuries were too remote from the university's negligence to hold it liable. *Id.* at 88. Our considerations in support of applying the remoteness public policy were that the injuries occurred 30 hours after the checkout, the incident took place at a location removed from the dormitory and outside of the university's control, and Conroy's visit to the nightclub was not connected to her job duties. *Id.* at 88-89.

¶34 We are not persuaded that *Conroy* places a time limit upon which a defendant's negligence matters. Under those facts, the distance in space and time broke the chain of causation from the university's negligence. Here, the time between medical visits to the CHW campus, which was under CHW's control, did not break the chain.

*B. Second public policy factor: proportionality to culpability*

¶35 The second public policy factor assesses whether the Krupka family's injuries are wholly out of proportion to CHW's culpability. This consideration contemplates "the discrepancy between the degree of negligence and the degree of injury[.]" *Fandrey ex rel. Connell v. American Fam. Mut. Ins. Co.*,

2004 WI 62, ¶15 n.12, 272 Wis. 2d 46, 680 N.W.2d 345 (citation omitted). CHW argues that its liability is disproportionate to its culpability.[7]

¶36 Case law again illustrates this factor. In **Kidd**, discussed above, our supreme court rejected the parents' attempt to hold the second driver "fully responsible" for the mutilation of their daughter's body, along with the parents' resulting emotional distress and physical injuries, based on this second public policy factor as well as the first factor. **Id.**, 338 Wis. 2d 129, ¶17. The court concluded that holding the second driver's responsible for the injuries would be out of proportion to his culpability. **Id.**

¶37 Further, in **Fandrey**, our supreme court determined that "recovery … would be too out of proportion with the culpability" of homeowners whose dog bit a child. **Id.**, 272 Wis. 2d 46, ¶¶3, 34. There, the homeowners left their dog at home, unleashed or caged, in their unlocked house, when a friend and her three-year-old daughter brought something to the house uninvited, entered the unlocked door, and while the mother wrote a note, the child was bitten by the dog. **Id.**, ¶2. Our supreme court concluded that the only thing the homeowners did wrong was to leave their door unlocked. **Id.**, ¶34. Therefore, the child's injuries were out of proportion to the homeowners' minor negligence. **Id.**

¶38 CHW argues that the Krupka family's claims are premised on CHW not doing enough to prevent Jade's attack on Mary. We consider this framing misleading. The issue is not failing to be perfect, but failing to respond reasonably to a foreseeable risk. As we discussed under the first factor, CHW saw a risk of

---

[7] We note that CHW does not argue that the $7 million damages award for Mary's injuries were out of proportion to its culpability. We therefore do not discuss damages.

foreseeable harm from Vanessa and Jade's conduct—the security reports describe not only disorderly disturbances and cursing, but labeling the family as having a history of "violent behaviors" and warning Vanessa against "grabbing, hitting, or pushing." While in *Kidd*, it was out of proportion to hold the second driver fully responsible for the parents' injuries when there was another car accident and driver involved in their daughter's death, and in *Fandrey*, it was out of proportion to hold the homeowners liable for a dog bite when their only negligence was leaving their door unlocked, CHW's negligence is not out of proportion to Mary's injuries.

¶39     CHW argues that even if Vanessa had signed the behavioral contract, it would not have guaranteed Mary's safety. The issue here is not holding CHW liable for failing to guarantee safety. CHW was the proprietor of the business inviting the public, it knew of a safety risk—knowledge that other guests such as Mary and her children could not have—and it did not take reasonable steps to manage that risk.[8] A business proprietor is subject to liability

---

[8] We note that the jury was instructed on CHW's duty of care as a proprietor of a business open to the public. Wisconsin recognizes that business proprietors must exercise reasonable care to protect individuals visiting or using the business from injuries from foreseeable causes. *Pfeifer v. Standard Gateway Theater*, 259 Wis. 333, 336, 48 N.W.2d 505 (1951). Whether the proprietor has taken sufficient precautions to protect individuals on the premises is a question for the jury. *Id.* Here, the jury was instructed on the duty of CHW to protect a patron from injury caused by a third-party, WIS JI—CIVIL 8045. The instruction read to the jury stated:

(continued)

17

if members of the public are harmed while on premises due to a third-party's accidental, negligent, or intentionally harmful acts "if the proprietor by the exercise of reasonable care could have discovered" these acts and could have protected the patron "by controlling the conduct of the third persons, or by giving a warning adequate to enable them to avoid harm." *Weihert v. Piccione*, 273 Wis. 448, 456, 78 N.W.2d 757 (1956). With this obligation to patrons and duty of care in mind, we do not consider CHW's negligence to be out of proportion to its culpability.

### C. Third public policy factor: Too highly extraordinary

¶40 Addressing the third factor that "in retrospect it appears too highly extraordinary that the negligence should have brought about the harm," *Nichols v. Progressive N. Ins. Co.*, 2008 WI 20, ¶24, 308 Wis. 2d 17, 746 N.W.2d 220 (citation omitted), CHW argues that the Krupka family's harm should be considered too wholly extraordinary because Jade's conduct was unpredictable, "erratic and irrational." *See Estates of Paswaters v. American Fam. Mut. Ins. Co.*, 2004 WI App 233, ¶1, 277 Wis. 2d 549, 692 N.W.2d 299 ("Good social

> As the proprietor of a medical [clinic] who opens it to the public for its business purposes, Children's Hospital has a duty to use ordinary care to protect members of the public while on the premises from harm caused to them by the accidental, negligent, or intentional acts of third persons. If by using ordinary care, it could have discovered that the acts were being done or were about to be done, and it could have protected Mrs. Miceli-Krupka by controlling the conduct of the third person, or by giving a warning adequate to enable Mrs. Miceli-Krupka to avoid harm. However, Children's Hospital is not required to guarantee the safety of patrons against injuries inflicted by other patrons on the premises.

policy does not allow us to impose liability on individuals who fail to predict erratic and irrational human behavior.").

¶41    Turning to case law, in *Conroy*, we concluded that even if we assumed the university's negligence in directing Conroy to check out an expelled student without informing her of the cause of expulsion, it was too highly extraordinary that its negligence resulted in such "drastic consequences" as the harm suffered by Conroy. *Id.*, 220 Wis. 2d at 90-91. We concluded that "[n]o one could have reasonably expected that an ill-tempered student, who had acted inappropriately but had not exhibited violent tendencies, would brutally assault another student with a broken bottle off-campus thirty hours later, in revenge for her expulsion." *Id.* at 91. Nothing put the university on notice that the expelled student "would likely physically attack" Conroy or that she would seek revenge on Conroy. *Id.*

¶42    In *Paswaters*, we concluded that a woman's murder by her boyfriend was too highly extraordinary of a result to hold liable her boyfriend's brother, who arranged their meeting. *Id.*, 277 Wis. 2d 549, ¶¶1, 15. The brother allowed the boyfriend to secretly eavesdrop on a meeting the brother arranged with the girlfriend to discuss romantic difficulties between the couple and the brother did not warn the girlfriend that her boyfriend was present or that he "had expressed a desire to kill her earlier that evening." *Id.*, ¶1. We concluded that the brother should not shoulder "the unreasonable burden of predicting human nature" because he knew the boyfriend (his brother) as a non-violent person, there were no allegations of domestic violence, and the boyfriend's "characteristic and harmless way of expressing anger" included expressing a desire to kill others or himself. *Id.*, ¶15. The brother felt he was trying to allow the couple to resolve relationship issues, not set up the girlfriend so her boyfriend could "end the relationship with

fatal violence." ***Id.***, ¶16. This court concluded that the shooting death was too highly extraordinary to hold the brother liable because he knew his brother often "shot his mouth off" and did not expect any physical violence, much less a shooting. ***Id.***, ¶¶5, 15-16.

¶43 CHW argues that Jade's conduct was unexpected and irrational.[9] As we discussed in relation to the first two factors, CHW's internal security reports were concerned about the family exhibiting "disorderly, disruptive and violent behaviors" as well as touching staff or restricting staff's movement and "grabbing, hitting, or pushing[.]" CHW developed a safety plan that involved security in future appointments and barred Jade from attending clinic appointments. Unlike ***Conroy***, CHW was on notice that Jade was disruptive and disorderly at CHW facilities. Unlike ***Paswaters***, CHW had personal knowledge that Jade and Vanessa were disruptive, had terrified a waiting room of children and families, and had trapped a staff member in a patient room and laughed while security attempted to respond. Having Jade, a previously disruptive visitor to the clinic with known security concerns, become physically violent cannot be termed "highly extraordinary." *See **Tesar***, 329 Wis. 2d 240, ¶17.

---

[9] CHW also argues that holding it liable for Mary's injuries would be too extraordinary because the attack came out of nowhere. Although the record reflects that Broughton, who witnessed the attack, described it as a surprise, and Mary testified that she was not expecting anything like that, there were signs of concern even that day. Broughton also testified that there was "tension in the air" before anything happened and that she heard Neilsen tell Jade something to the effect of "we talked about this before, knock it off." John Michael testified that before he involved his mother, he was frightened by Jade's angry expression and warning words that she would "get you." Whether Jade's behavior was unexpected in the context of that day or over five years of previous security incidents, we are not persuaded that it was too highly extraordinary to hold CHW liable for the Krupka family's harms.

### D. Fourth public policy factor: unreasonable burden

¶44 The fourth public policy factor we consider is whether "permitting recovery would place too unreasonable a burden" on the defendant. *Hoida, Inc. v. M & I Midstate Bank*, 2006 WI 69, ¶43, 291 Wis. 2d 283, 717 N.W.2d 17. CHW argues that allowing recovery under these facts would place an unreasonable burden on healthcare providers to attempt to avoid liability.

¶45 Returning to the homeowners with the dog who bit a child in *Fandrey*, our supreme court concluded that it would be an unreasonable burden on homeowners to be required to do "more than keep their dogs in the house when the homeowners are away[.]" *Id.*, 272 Wis. 2d 46, ¶35. If liability were imposed, there would be "clearly unreasonable consequences," such as dog owners feeling "forced, prior to leaving their homes, to kennel their dogs, muzzle them, or lock them in cages" to avoid liability. *Id.*

¶46 Similarly, in *Hoida*, our supreme court concluded that imposing liability would place too unreasonable a burden on a title company, which acted solely at the direction of a bank, for the disbursal of funds under a construction loan where the general contractor and owner of the property fraudulently misappropriated more than $650,000 in construction funds. *Id.*, 291 Wis. 2d 283, ¶¶1, 43. Hoida, a subcontractor who incurred losses working on the project, sued the bank and title company, arguing they were negligent for failing to verify the work in progress before disbursing funds. *Id.*, ¶1. The court concluded that Hoida's claim would require the title company to identify and track all subcontractors, services, and goods, then assess whether disbursements are appropriate under the project progress, and collect lien waivers. *Id.*, ¶43. Not only was this "never-ending task" not the title company's job, Hoida did not allege

that the title company had the special expertise to evaluate construction progress. *Id.* Therefore, Hoida's claim was precluded by the unreasonable burden that holding it liable would bring. *Id.*

¶47 CHW argues that the Krupka family's claims were based on a nebulous standard of care. It asserts that Butler's testimony supports that banning Kendra and her family or a structured security response were the only ways CHW could have satisfied the standard of care the Krupka family posits. We reject this premise. The record reflects that Butler opined that if CHW had followed healthcare security industry guidelines, it could have avoided the situation. In *Fandrey*, our supreme court identified that imposing liability would impose unreasonable obligations on dog owners to keep their dogs muzzled and caged when home alone. In *Hoida*, the court identified that liability would create a never-ending task with obligations not alleged to be within a title company's skillset or function. Here, it does not put too unreasonable a burden on CHW to carry out the security and safety plans it creates and to take reasonable actions to respond to known safety concerns.

*E. Sixth public policy factor: a field with no stopping point*

¶48 The sixth public policy factor considered is whether liability would "unnecessarily allow the law of negligence to enter a field that has no sensible or just stopping point." *Rockweit by Donohue v. Senecal*, 197 Wis. 2d 409, 428, 541 N.W.2d 742 (1995). CHW argues that allowing liability under these facts would

open the floodgates to claims of all kinds.[10]  It asks the court to consider "wider societal implications of liability" to not allow this set of facts to "ripple out to cause disproportionate burdens and costs that the greater public will bear."

¶49    Case law illustrates the concerns raised under the sixth public policy factor.  The *Fandrey* court determined that there was no evidence of express or implied consent for the mother and her three-year-old daughter to enter her friend's unlocked home before the homeowner's dog bit her daughter.  *Id.*, 272 Wis. 2d 46, ¶36.  The court concluded that imposing liability on homeowners who left a dog in an unlocked home and then that dog bit a person who entered the house without consent would "enter a field that has no sensible or just stopping point." *Id.*  If liability could be imposed for a dog bite to a non-consensual visitor, then a homeowner would risk having liability to a burglar for a dog bite, which was not sensible or just.  *Id.*, ¶39.  In contrast, holding CHW liable for its failure to protect patrons from a risk it recognized and foresaw does not mean that all healthcare providers would face unjust, or unreasonable liability.

¶50    CHW argues that the verdict and circuit court's post-verdict decision, denying that public policy precludes liability, failed to give meaningful guidance to future healthcare providers on when they must ban disruptive patients

---

[10] There were two amici briefs submitted by other healthcare-related organizations that also argue that allowing recovery in this case would hurt healthcare providers by increasing their liability.  CHW also argues that liability here could increase the need for healthcare spending on security, which could then impact patient care.  We appreciate these concerns, but consider our decision to be narrowly tailored to the specific facts presented.  As this court has noted previously, "[n]o future Wisconsin court is required or encouraged to venture into cases which shock the conscience of society by anything we have written here.  Public policy is decided on a case-by-case basis and we only decide the issue before us." *Tesar v. Anderson*, 2010 WI App 116, ¶35, 329 Wis. 2d 240, 789 N.W.2d 351.

and families to avoid liability. It contends there was no clear line before the violent attack at which CHW was negligent by not banning Jade or Vanessa.[11]

¶51 We are not persuaded that the liability question is reduced to when to ban a patient. From the briefing and evidence at trial, disruptive and unsafe behavior is not uncommon in healthcare and certain regulations require care be offered in emergencies. CHW, like any reasonable hospital system, has a security services department, with staff who proactively and reactively deal with security incidents. The record also reflects that local law enforcement is called in for certain events. The imposition of liability here arises from these facts and CHW's own unreasonable actions and omissions, not from a broad imposition of liability to healthcare providers for any conduct that may arise on their premises regardless of their actions.

¶52 We consider another case in which our supreme court concluded that the sixth public policy factor was "of greatest concern." *Hornback v. Archdiocese of Milwaukee*, 2008 WI 98, ¶53, 313 Wis. 2d 294, 752 N.W.2d 862. Examining the differences in foreseeable risk makes it clear that imposing liability on CHW does not allow negligence to enter a field with no sensible or just stopping point. In *Hornback*, victims of a Catholic school teacher in Kentucky who sexually abused students attempted to hold the Archdiocese of Milwaukee and Diocese of Madison liable because those bodies were aware the teacher had previously sexually abused students at Catholic schools while teaching in the Milwaukee and Madison areas. *Id.*, ¶2. The victims brought a claim based on negligent failure to

---

[11] After the attack, CHW argues it was clear, and the record reflects, that it did ban Jade and Vanessa from the CHW campus.

warn, premised on a church employer's duty to "seek out, find, and warn future employers of sexually dangerous former employees[.]" *Id.*, ¶45. The church bodies warned that if the claim were allowed to proceed, it would create "a slippery slope" that would "requir[e] employers to warn all prospective employers about any bad acts of ex-employees." *Id.*, ¶53.

¶53 The *Hornback* claim of negligent failure to warn was not based on a claim that either diocese withheld information about the abusive teacher or refused to provide an honest disclosure. Instead, it created a duty for a church employer to seek out other Catholic school systems to proactively warn them about the teacher's past abusive acts. In contrast, CHW is being held liable for its ordinary negligence in responding to a foreseen risk, not for failing to seek out, find and warn others about a danger it recognized.

¶54 Further, the *Hornback* claim argued that "unforeseeable third parties" should be warned about the abusive teacher, with a potential need to warn "thousands of individuals and organizations," in dioceses, parochial school systems, and parents across the country. *Id.*, ¶¶26, 57. This was an "open-ended and ill-defined sweeping claim" that would have no sensible stopping point. *Id.*, ¶60. In contrast, the Krupka family's claim was narrowly defined, and premised on harm to Mary and accompanying harms to her spouse and children. We conclude that allowing the Krupka family's recovery does not enter a field with no just stopping point.

### F. Public policy factor conclusions

¶55 A Wisconsin court is to preclude liability only in "cases so extreme that it would shock the conscience of society to impose liability." *Fandrey*, 272

25

Wis. 2d 46, ¶15 (citation omitted). We conclude that none of the public policy factors apply to preclude CHW's liability for the Krupka family's injuries.

## II. Negligence

¶56 We now turn to CHW's second issue, namely that the Krupka family failed to prove a breach of its duty of ordinary care; therefore, the claim of negligence must fail. A plaintiff establishes a negligence claim by proving four elements: (1) the defendant's duty of care, (2) "a breach of that duty of care (3) a causal connection between the defendant's breach of the duty of care and the plaintiff's injury, and (4) actual loss or damage resulting from the injury." *Gritzner*, 235 Wis. 2d 781, ¶19.

¶57 CHW argues that there is no credible evidence that it committed a breach of ordinary care, asserting that the jury's verdict was based on impermissible speculation. A claim that no credible evidence of a breach was presented and upon which the jury could rely challenges the sufficiency of the evidence to support the verdict. "Our review of a jury's verdict is narrow." *Morden*, 235 Wis. 2d 325, ¶38. We will "sustain a jury verdict if there is any credible evidence to support it." *Id.* We must "consider the evidence from a viewpoint most favorable" to the verdict. *Coryell v. Conn*, 88 Wis. 2d 310, 317, 276 N.W.2d 723 (1979). "The obligation is to search for credible evidence that will sustain the verdict, not for evidence to sustain a verdict the jury could have but did not reach." *Id.* at 317-18.

¶58 CHW asserts that the Krupka family failed to present expert medical or clinical testimony to support that a reasonable hospital would have banned Jade, Vanessa, and Kendra prior to Jade's attack of Mary. CHW argues that Butler testified that CHW could have prevented the attack by banning Jade or having a

structured security response when Kendra had appointments. CHW contends that in Butler's cross-examination testimony, he acknowledged that security alone does not make the decision to ban a patient or family, but it must be a joint decision for the risk, safety, legal and clinical departments. CHW contends that without expert medical testimony on the reasonableness of banning Kendra and family, the jury's finding had to be speculative.

¶59     Expert testimony may be "required to assist the court or jury to understand complex issues," particularly in matters of certain medical-related claims. *Cramer v. Theda Clark Mem'l Hosp.*, 45 Wis. 2d 147, 151, 172 N.W.2d 427 (1969). However, even allegations related to medical care do not require expert testimony if the matters may be "judged against the care a reasonable and ordinary lay person would expect a hospital … to give under the circumstances." *Id.* at 154.

¶60     CHW's premise that expert medical testimony was required to prove a breach because banning Kendra's family was the only way to combat the risk is not supported by the record. Butler opined that CHW's conduct was unreasonable because it recognized a safety issue and then failed to take steps to manage that risk. The record reflects that Butler did not opine that banning Kendra was the only option a reasonable hospital could have taken.[12] Butler acknowledged that

---

[12] It is less clear whether CHW is arguing that a "structured security" initiative or response would also require expert medical testimony. To the extent that we interpret CHW as asserting that Butler's expert opinion was that CHW had to have Security Services respond to every appointment Kendra made, our examination of the record shows that Butler opined that was an option. He discussed that CHW did not appear to follow the Safety Plan it designed that called for Security Services to be notified when Kendra checked in for an appointment. CHW does not appear to argue that expert medical testimony would be needed to aid the jury in understanding scientific or specialized information as it relates to having Security Services be alerted about appointments.

emergency care had different standards than clinics, he separated Kendra's clinical needs from the conduct of her mother and sister, and he discussed how CHW did not utilize any of the safety and security processes available. We conclude that establishing the breach of ordinary care under these circumstances does not require specialized, scientific, or technical knowledge such that expert medical testimony would be required. *See Payne v. Milwaukee Sanitarium Found., Inc.*, 81 Wis. 2d 264, 276, 260 N.W.2d 386 (1977) (stating that "[e]xpert testimony should be adduced concerning those matters involving special knowledge or skill or experience on subjects which are not within the realm of the ordinary experience of mankind, and which require special learning, study or experience").

¶61    There was ample evidence upon which the jury could find that CHW was negligent without needing expert medical testimony. When we both consider the evidence in the light most favorable to the jury's findings and search for credible evidence that will sustain the verdict, we conclude that the jury had ample evidence upon which to find CHW breached its duty, without relying on speculation. *See Coryell*, 88 Wis. 2d at 315, 317-18. Butler's testimony and the CHW security incident reports provided evidence of recurrent disruptive behavior when Kendra's family sought care at CHW over the course of five years. CHW created a Safety Plan and behavioral contract for Kendra to continue receiving care at CHW with or without her mother or sister's presence. The Safety Plan allowed only Vanessa to accompany Kendra to appointments until further notice, yet Jade was present that day. Although the Safety Plan stated that Security

Services should be contacted when Kendra checked in, there is no evidence that Security Services was notified when the family arrived.[13]

¶62 CHW then argues that Jade's attack on Mary was an erratic, irrational act by Jade, one that constitutes an unforeseeable harm. It argues there was no evidence presented that a reasonable hospital under these circumstances would have recognized that allowing Jade to sit in the waiting room during Kendra's appointment created an unreasonable risk of harm. Foreseeability asks whether "the defendant, as a reasonably prudent person," should "have anticipated that the act would probably cause damage to another[.]" *Osborne v. Montgomery*, 203 Wis. 223, 231, 234 N.W. 372 (1931). Under these facts, a reasonably prudent hospital would have recognized a risk of harm from Jade's presence in the waiting room, in light of the record of security incident reports demonstrating disruptive behavior by Jade and Vanessa from 2009 to 2013, the warnings to Vanessa that Kendra's care could be terminated for the family's actions, and the warning flag for the Safety Plan on Kendra's electronic medical chart. CHW argues that no new security incidents had happened after May 2013; however, the record does not reflect that the Safety Plan was removed or modified.[14] "[I]f there is any credible evidence, under any reasonable view, that leads to an inference

---

[13] CHW's decision after the attack to require advanced notification to Security Services of Kendra's clinic appointments and to ban Vanessa and Jade from the CHW campus shows that, as a practical matter, CHW had that option before the attack.

[14] CHW further argues that the Krupka family failed to present evidence that Kendra's healthcare provider would have enforced the Safety Plan if asked or that if Security Services had been notified, that there was sufficient staff to reach the Diabetes Clinic. We reject these attempts on appeal to reframe CHW's duty and the evidence required to show breach. Our "obligation is to search for credible evidence that will sustain the verdict, not evidence to sustain a verdict the jury could have but did not reach." *Coryell v. Conn*, 88 Wis. 2d 310, 317-18, 276 N.W.2d 723 (1979).

supporting the jury's finding," we must sustain the verdict. ***Morden***, 235 Wis. 2d 325, ¶38. We conclude that CHW's challenge to the sufficiency of the evidence fails.

## CONCLUSION

¶63    For the reasons discussed above, we conclude that none of the public policy factors preclude CHW's liability to the Krupka family for their injuries. We also conclude that there was sufficient evidence to support the jury's finding of a breach of ordinary care and we affirm the jury's finding of negligence.

*By the Court.*—Judgment affirmed.

Not recommended for publication in the official reports.