KELLI T-G., a minor, by her Guardian Ad Litem, Paul J. Scoptur, and Carolyn T., Plaintiffs-Appellants,

v.

Gerald A. CHARLAND, Defendant,

Patricia K. NEUBAUER , f/k/a/ Patricia K. Charland and American Family Mutual Insurance Company, Defendants-Respondents. †

Court of Appeals

*No. 95–0468. Submitted on briefs September 6, 1995.—Decided November 14, 1995.*

(Also reported in 542 N.W.2d 175.)

†Petition to review denied.

For the plaintiffs-appellants the cause was submitted on the briefs of *Aiken & Scoptur, S.C.*, with *Timothy J. Aiken*, and *Kelly L. Centofanti*, of Milwaukee.

For the defendants-respondents the cause was submitted on the briefs of *Peterson, Johnson & Murray, S.C.*, with *James T. Murray, Jr.*, and *Dan J. Gendreau*, of Milwaukee.

Before Sullivan, Fine and Schudson, JJ.

SCHUDSON, J. Kelli T., by her guardian ad litem, and her mother Carolyn T., appeal from the trial court judgment granting summary judgment to Patricia K. Neubauer and American Family Mutual Insurance Company, her homeowner's insurer (collectively, "Neubauer"). They argue that the trial court incorrectly concluded that Neubauer had no duty to warn Carolyn T. that Neubauer's ex-husband, Gerald A. Charland, was a pedophile who posed a danger to Kelli. Although our analysis differs from that of the trial court, we also conclude that Neubauer had no legal duty to warn Carolyn T. and, therefore, we affirm.

The facts essential to resolution of this appeal are undisputed. On July 15, 1991, Charland sexually abused Kelli T., who was six years old. Kelli and her mother filed an action against Charland and Neubauer, Charland's ex-wife, for damages resulting from the abuse. They alleged that Neubauer knew that Charland was a pedophile with a history of sexually

assaulting children, knew or should have known that Charland was likely to continue such abuse, and placed Kelli at risk by failing to warn Kelli's mother.

Neubauer and Charland married in March 1985. They separated approximately eight months later and, a few months after that, Neubauer filed for divorce. Their divorce became final in May 1989. When they married, Neubauer did not know that Charland had been convicted of three counts of fourth-degree sexual assault of children in 1984. Although Neubauer learned in July 1985 that Charland was on probation, she did not know why. It was not until his November 1985 arrest for mailing child pornography that Neubauer learned that his prior convictions were for child sexual assaults. Although no charges resulted from the child pornography arrest, Charland's probation was extended for two years with the addition of six months incarceration on work-release. Prior to the sexual assault of Kelli, Neubauer also became aware that Charland had molested two of his nieces and one of his co-worker's daughters prior to 1984.

Neubauer and Charland had a daughter, Geri, who also was six years old at the time of the assault on Kelli. Although Charland had not been allowed unsupervised visitation with Geri at the time of the divorce, by approximately January of 1991, he was allowed unsupervised visitation with her. After Charland met Kelli's mother in 1991, Geri and Kelli began to play together, sometimes at Charland's house. By that time, Charland had completed his counseling with a psychologist and had completed probation.

In approximately April or May 1991, Neubauer met Carolyn T. and became aware that Geri sometimes played with Kelli in Charland's home. Although there is some factual dispute as to Carolyn T.'s relationship

with Neubauer, it is undisputed that Neubauer had occasional contact with Carolyn T., for the most part limited to brief encounters and conversations when she dropped off or picked up Geri for visits with Charland.

In response to deposition questions from Attorney Paul J. Scoptur, Kelli's guardian ad litem, Neubauer expressed her concern about Charland's potential danger:

> [MR. SCOPTUR]: [D]uring the time you were divorced in May of '89, did you come to the realization that without counseling he was probably going to continue on with what he did in the past?
>
> [MISS NEUBAUER]: Right. I firmly believe that. With the way he talked, his thoughts, his ideas, he—it is bound to happen.
>
> [MR. SCOPTUR]: You believe that today, I presume?
>
> [MISS NEUBAUER]: Yes. It confirms to me what I believed at the time.

Neubauer also told of her intention to tell Carolyn T. of Charland's history:

> [MISS NEUBAUER]: I had given [Carolyn T.] my phone number. She says that she went over to [Charland's] so Kelli had someone to play with. And so I said, well, if you'd like to bring your daughter over to play with Geri, I gave her my phone number.
>
> [MR. SCOPTUR]: Geri would be your daughter?
>
> [MISS NEUBAUER]: Right. I gave her my phone number, asked her to call me. I planned to tell her of his offenses but she never called and I didn't have her number.
>
> . . . .

127

[MR. SCOPTUR]: Obviously you had planned to tell her because you were concerned about Kelli?

[MISS NEUBAUER]: Yes.

. . . .

[MR. SCOPTUR]: And I take it you felt an obligation to tell her about this but you were waiting for the right time?

[MISS NEUBAUER]: Um-hm (affirmative). Also, I think she needed to make the phone call. You know, I can't seek out people and tell them these things.

Neubauer moved for summary judgment contending that Wisconsin law imposes no duty to warn of a person's potential dangerousness absent a special relationship between either that person and the potential victim, or that person and the one who had the claimed duty to warn. Granting summary judgment, the trial court agreed, concluding that Neubauer did not have a special relationship with Carolyn T., and thus had no legal duty to warn her of Charland's potential danger.

Our review of summary judgment is *de novo*. *See Green Spring Farms v. Kersten*, 136 Wis. 2d 304, 315, 401 N.W.2d 816, 820 (1987). Summary judgment must be entered if the evidentiary submissions establish "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." RULE 802.08(2), STATS. Further, as the supreme court explained:

> [T]he existence of a duty and the scope of that duty are questions of law for the court to decide. Where the facts which are alleged to give rise to a duty on the part of a defendant are agreed upon, the question of whether any duty existed is one of law which

the court may decide on a motion for summary judgment.

*Ceplina v. South Milwaukee Sch. Bd.*, 73 Wis. 2d 338, 341-342, 243 N.W.2d 183, 185 (1976).

The parties offer excellent arguments over whether Wisconsin law imposes a common law duty to warn third persons of potential dangers in the absence of a special relationship, and whether Neubauer had a special relationship with Carolyn T. and Kelli. As the trial court decision noted, each party could muster substantial support from the authorities and "[t]his seeming dichotomy in Wisconsin law allowed both parties to argue well from different postures." We conclude, however, that we need not confront the common law duty/special relationship questions because the issue in this case is clearly resolved on public policy grounds.

"The application of public policy considerations is solely a function of the court, and does not in all cases require a full factual resolution of the cause of action by trial before policy factors will be applied by the court." *Hass v. Chicago & N.W. Ry.*, 48 Wis. 2d 321, 326-327, 179 N.W.2d 885, 888 (1970) (citation omitted). In *Coffey v. Milwaukee*, 74 Wis. 2d 526, 247 N.W.2d 132 (1976), the supreme court reiterated the six public policy factors that can preclude liability in a negligence case:

> [E]ven where the chain of causation is complete and direct, recovery may sometimes be denied on grounds of public policy because: (1) the injury is too remote from the negligence; or (2) the injury is too wholly out of proportion to the culpability of the negligent tort-feasor; or (3) in retrospect it appears

> too highly extraordinary that the negligence should have brought about the harm; or (4) because allowance of recovery would place too unreasonable a burden on the negligent tort-feasor; or (5) because allowance of recovery would be too likely to open the way to fraudulent claims; or *(6) allowance of recovery would enter a field that has no sensible or just stopping point.*

*Id.* at 541, 247 N.W.2d at 140 (emphasis added). "Any one of these public policy considerations could be sufficient to deny recoverability." *Rieck v. Medical Protective Co.*, 64 Wis. 2d 514, 518, 219 N.W.2d 242, 244 (1974).

Although Carolyn T. has offered strong arguments that could very well clear the hurdles erected by the first five factors, she addresses the sixth by contending merely that "recovery would not enter a field that has no sensible or just stopping point because it would be limited to cases where foreseeability of harm is clear, as here, and where the foreseeable victim is known." We conclude, however, that such a limitation would be virtually impossible to apply. Indeed, recovery would enter a field not only with no definable, sensible stopping point, but no sensible starting point as well.

Slight variations on the facts of this case illustrate the virtual impossibility of defining a sensible starting or stopping point. Would Neubauer's duty to warn depend on whether she knew of Charland's progress in counseling or compliance with probation? Would her duty depend on her assessment of whether the criminal justice system had adequately addressed the dangers Charland posed? Would Neubauer's duty have varied if she had been a mental health or criminal justice professional? If so, would her duty have further varied

according to her opinion about the appropriateness and adequacy of the probation and conditions ordered by the criminal court? If Charland had been charged but never convicted of child sexual abuse, and if Neubauer believed, nonetheless, that Charland was a pedophile, would she still have had a duty to warn? And if Neubauer had been wrong in her forecast of Charland's potential danger, would she have been liable to Charland for warning Carolyn T.?

Moreover, who would Neubauer have a duty to warn? Neubauer answers that she would have a duty to warn only those "where foreseeability of harm is clear . . . and where the foreseeable victim is known." Would that extend to the next door neighbor? Would that include every one of Kelli's close friends or classmates? To protect herself from potential liability, would Neubauer need to remain as ignorant as possible of Charland's activities and associations so that she would not come to know of his "foreseeable victims?" If so, ironically, any *moral* duty to warn that Neubauer otherwise might have felt would be undermined by potential liability for the *legal* duty she no longer could avoid.

Tragically, sexual abuse has brought devastating consequences to countless children and their families. Sadly, our society has discovered that many pedophiles elude the control of the criminal justice system. Many seem unchanged despite psychotherapeutic intervention and the rehabilitation efforts of corrections, probation, and parole. As pedophiles sexually abuse children again and again, some state legislatures, in a desperate effort to locate new methods to stop the assaults, debate whether to enact "neighborhood notification" laws to warn citizens of paroled child molesters living in their communities. Thus, legislatures debate

131

the appropriate scope of *government's* duty to warn and they struggle to define sensible starting and stopping points. For government, the struggle is extremely difficult as a matter of public policy. For an individual citizen, the struggle is extremely difficult as a matter of morality, and virtually impossible as a matter of law.

*By the Court.*—Judgment affirmed.