ESTATE OF Kimberly PASWATERS, by her Personal Representative, Christine Hagan, Cristalynn Paswaters, Mistie Paswaters, Noel Paswaters, and Heather Paswaters, by their Guardian ad Litem, David K. Sparr, Plaintiffs-Appellants,†

v.

AMERICAN FAMILY MUTUAL INSURANCE COMPANY and Harold Beck, Defendants-Respondents.

Court of Appeals

*No. 04–0532. Submitted on briefs October 7, 2004.—Decided November 10, 2004.*

2004 WI App 233

(Also reported in 692 N.W.2d 299.)

† Petition to review denied 1-11-2005.

On behalf of the plaintiffs-appellants, the cause was submitted on the briefs of *Timothy J. Aiken* and *James C. Gallanis* of *Aiken & Scoptur, S.C.* of Milwaukee.

On behalf of the defendants-respondents, the cause was submitted on the brief of *Colleen D. Ball* of Wauwatosa and *William R. Wick* of *Nash, Spindler, Grimstad & McCracken LLP* of Manitowoc.

Before Brown, Nettesheim and Snyder, JJ.

¶ 1. BROWN, J. This case involves a wrongful death action by the estate and minor children of shooting victim Kimberly Paswaters. The circuit court held that public policy considerations precluded imposing liability on Harold Beck for allowing his infuriated brother David Beck to secretly eavesdrop on a meeting Harold arranged with Kim to talk through some romantic difficulties she and David had been experiencing without warning her that David had expressed a desire to kill her earlier that evening. We affirm. David's threats to kill Kim and himself on the fatal night were consistent with how David characteristically expressed anger, while his eruption into actual violence was an unprecedented occurrence. Good social policy does not allow us to impose liability on individuals who fail to predict erratic and irrational human behavior.

¶ 2. Both parties stipulate to all the material facts in this case. They are as follows. On January 6, 2001, David murdered his girlfriend Kim, shooting her at close range five times with a Baretta nine-millimeter

semiautomatic pistol. The shooting took place at the Campbellsport Fire Department in the presence of David's brother Harold.

¶ 3. At the time of the shooting, David and Kim's relationship had been tumultuous and unstable for some time. They had dated for roughly a year and lived together for several months, but the relationship soured, and as of about six months prior to the shooting, their cohabitation ended. The record reflects no history of domestic violence between the two, and Harold was not aware of any.

¶ 4. On the night of the shooting, a very upset David called Harold at around six o'clock. He was upset because he did not understand why his relationship with Kim was not going well. David had asked another brother, Jim, to intercede and talk to Kim for him about the relationship, but Jim had refused to get involved, so David called Harold instead. He urged Harold to talk to her and expressed that he wanted support from his family in working through these romantic difficulties. Harold agreed to mediate the dispute and call Kim.

¶ 5. During this conversation, David had threatened that he was going to "take care of business tonight," that "he was fed up [and] couldn't take it no more." He explained that by "take care of business," he meant killing both Kim and himself. Harold did not take the threat seriously. He stated he did not pay much attention because "every time [David] got pissed off, he threatened to kill somebody or shoot himself." "[H]e always shot his mouth off . . . he always said that he'd do something and he never did." In fact, he had made similar comments to Harold about Kim roughly a month and a half earlier, stating that "he couldn't live

without her and he wanted her to hurt as much as she's hurting him." As usual when David "shot his mouth off," nothing happened.

¶ 6. As promised, Harold called Kim and left a message on her answering machine. While Harold awaited her response, David called back, still anxious about the status of the relationship but seemingly less upset. He suggested that when Kim returned Harold's call, Harold should ask to meet her at the Campbellsport Fire Department. Harold agreed that meeting at this spot was "a good idea" because it was "neutral ground" where he and Kim could talk without either party's children present. When David expressed a desire to be present, Harold told him it was his relationship and it was his choice whether he wanted to hear what Kim had to say.

¶ 7. Kim called back thirty to forty-five minutes after Harold left the message on her machine. She agreed to talk to Harold and to meet him at the firehouse in ten to fifteen minutes. Harold then called David to inform him about the meeting.

¶ 8. While Harold waited at the firehouse, David ran past him, shouting, "she's here" and ran upstairs to a mezzanine area, where Harold assumed he intended to hide while he eavesdropped on the conversation. Harold was aware that David owned a gun but had no idea that David had it with him that night. Kim arrived very shortly after David. Harold did not warn Kim about David's threats or that David was present at the meeting. He planned to reveal David's presence only after their conversation because he thought she would speak more openly if she did not know David was around. Harold admitted he expected David to call one or both of them a "liar" and to scream and yell if David heard something he did not like.

¶ 9. Harold and Kim began discussing the relationship. Kim expressed that she only desired friendship and that David was unreceptive to that because he wanted more. She admitted that the two were still having "on and off" sexual relations. Harold explained that he thought this dynamic might be confusing David, having a "yo-yo [e]ffect" on him, but Kim said she did not see it that way.

¶ 10. At that point, David ran down from his hiding place and began firing at Kim. When David finished shooting, he rolled Kim over and said, "It hurts now, don't it?" Harold stepped forward at that point to examine Kim's wounds, and David responded by pointing the gun at Harold, with his finger on the trigger. Harold told David to take it easy, and David made clear he did not want Harold to call an ambulance because there was already an EMT (meaning Harold) on the scene. As soon as David lowered the gun, Harold fled to his house and called 911.

¶ 11. On September 23, 2002, Kim's estate and her minor children commenced a wrongful death action against Harold and his liability insurer, American Family Mutual Insurance Company, alleging that Harold's negligence had caused Kim's death. The parties stipulated to: (1) the facts; (2) causation; (3) damages; and (4) Harold's negligence in order to get declaratory judgment or summary judgment on the issue of whether—assuming Harold was negligent—public policy considerations would nonetheless bar liability.

¶ 12. The circuit court announced its ruling on December 30, 2003. It held that public policy did in fact preclude liability in this case and granted the defendants' motion for summary judgment. The court cited several reasons for its ruling, including: (1) the highly extraordinary nature of the result; (2) the fact that

liability would not have any sensible stopping point; (3) liability "would place an unreasonable burden on people to try to predict human nature"; and (4) the harm caused in this case was out of proportion to Harold's culpability. The plaintiffs appeal.

¶ 13. We review a motion for summary judgment de novo, using the same well-established methodology as the circuit court. *See Green Spring Farms v. Kersten*, 136 Wis. 2d 304, 314–17, 401 N.W.2d 816 (1987); *Lambrecht v. Estate of Kaczmarczyk*, 2001 WI 25, ¶¶ 20–24, 241 Wis. 2d 804, 623 N.W.2d 751. We will grant summary judgment relief when the moving party is entitled to judgment as a matter of law and no genuine issue exists as to any material fact. *Green Spring Farms*, 136 Wis. 2d at 315. Here, the parties have stipulated to all material facts, and we are left with only a question of law that we review independently, namely, whether public policy precludes liability for Harold's negligence. *See Gritzner v. Michael R.*, 2000 WI 68, ¶ 27, 235 Wis. 2d 781, 611 N.W.2d 906.

¶ 14. Public policy considerations can preclude negligence liability even when a plaintiff has proven its case. *Id.*, ¶ 26. The courts have specifically recognized six considerations, any *one* of which will cut off liability if present. *See id.*, ¶ 27. We will not recognize liability when: (1) the injury is too remote from the negligence; (2) the injury is wildly out of proportion to the tortfeasor's culpability; (3) in retrospect it appears too highly extraordinary that the defendant's negligence resulted in the harm; (4) allowing recovery would place an unreasonable burden on the tortfeasor; (5) allowing recovery would open the way for too many fraudulent

claims; or (6) allowing recovery would enter a field that has no sensible or just stopping point. *Id.*

■

¶ 15. This case implicates at least two of the policy considerations above. We first observe that liability would shoulder Harold with the unreasonable burden of predicting human nature, which in David's case was highly erratic and irrational.[1] Harold expected David to yell, scream, and verbally assault both Kim and himself. This result was consistent with the David that Harold knew. To expect Harold to avoid the unexpected actual result—murder *in his presence*—would require him to *ignore* the facts he knew to be true at the

[1] The appellants are correct that we will hold a negligent defendant liable for unforeseeable consequences of his or her conduct as well as foreseeable ones. *A. E. Inv. Corp. v. Link Builders, Inc.*, 62 Wis. 2d 479, 484, 214 N.W.2d 764 (1974). However, we will not do so to the extent that imposing liability would violate public policy.

The circuit court cited *Conroy v. Marquette University*, 220 Wis. 2d 81, 582 N.W.2d 126 (Ct. App. 1998), for the proposition that imposing liability would "place an unreasonable burden upon people to try to predict human nature." *Conroy* did not characterize the policy issue as an "unreasonable burden" issue. Instead it held that in retrospect, it was too highly extraordinary that Marquette's negligence, allowing a student employee to check an expelled student out of her room, should have brought about the harm, namely, the expelled student's attack on the student employee. *Id.* at 90–91. In reaching its holding, however, the court observed that Marquette had no notice that a physical attack was likely, *id.*, and observed that the assailant's conduct "was not the sort of behavior that was rational or predictable," *id.* at 90. We therefore conclude that it makes little difference whether we characterize the issue as one involving the extraordinary result consideration or the unreasonable burden consideration.

time of the shooting: (1) David was a nonviolent person who had never hurt anyone before; (2) in fact, despite the tumultuous nature of his relationship with Kim, there was no history whatsoever of domestic violence; (3) expressing a desire to kill others and himself was David's characteristic and harmless way of expressing anger; and (4) David had asked for Harold's *help* in understanding what went wrong with the relationship. In short, Harold would have had to thoroughly discount *years* of familiarity and experience with David's personality and behavior and guessed that his brother unwittingly planned to use him as a pawn in a scheme to murder someone.

¶ 16. In addition to the unreasonableness of saddling Harold with the burden of predicting human behavior, we conclude that Harold's culpability is grossly out of proportion to the result of murder. Harold expected his brother to yell and scream, essentially to "shoot his mouth off" as was his habit. He should not have exposed Kim to this sort of unpleasantness. However, he was merely attempting to resolve a dispute between David and Kim in a way he thought would allow Kim to feel comfortable about being honest about her feelings. He was trying to help his brother *resolve* his relationship problems, not to set Kim up so David could end the relationship with fatal violence, an extraordinary result he could not have anticipated.

¶ 17. In arguing that *none* of the six public policy considerations apply, the appellants attempt to distinguish this case from several others. They differentiate *Gritzner* and *Kelli T-G. v. Charland*, 198 Wis. 2d 123, 542 N.W.2d 175 (Ct. App. 1995), on the ground that in those cases, the defendants merely knew that a third person had dangerous propensities, whereas here, David singled out Kim as his particular intended victim

557

and specified that he wanted to kill her that night (after which Harold took actions that facilitated the execution of that threat).

¶ 18. In *Kelli T-G.*, this court refused to impose a "duty to warn" on the defendant, who knew that her daughter's friend often played with her daughter at her ex-husband's house, yet failed to inform the child's mother that her ex-husband had pedophilic propensities. *Kelli T-G.*, 198 Wis. 2d at 125–27. In *Gritzner*, the court unanimously held only that a duty to warn would exist if required by one's legal duty to exercise ordinary care in "all activities," *Gritzner*, 235 Wis. 2d 781, ¶¶ 22, 43 (Wilcox, J., lead opinion); *id.*, ¶¶ 76, 77 (Abrahamson, C.J., concurring),[2] but a majority held that a full factual record was necessary before deciding whether public policy considerations precluded liability in that case. *Id.*, ¶¶ 75, 85–86. That case involved allegations that the defendant allowed his girlfriend's ten-year-old boy to play with his neighbor's four-year-old girl without informing the girl's mother that the boy had molested other children in the past. *Id.*, ¶¶ 1, 7–11. The appellants opine that *Gritzner* and *Kelli T-G.* probably would have come out differently, i.e., *decisively in favor*

---

[2] *Kelli T-G. v. Charland*, 198 Wis. 2d 123, 129, 542 N.W.2d 175 (Ct. App. 1995), appeared to establish a bright-line rule that, as a matter of public policy, there can never be a common law duty to warn third persons of potential dangers in the absence of a special relationship. In *Gritzner v. Michael R.*, 2000 WI 68, 235 Wis. 2d 781, 611 N.W.2d 906, both the supreme court majority and the minority rejected this bright-line rule in favor of a case-by-case approach. Thus, to the extent that *Kelly T-G.* announced a bright-line rule, *Gritzner* sub silentio has overruled *Kelly T-G.*

of liability, had the third person expressed to the defendant an interest in harming the particular victim at a particular time.

¶ 19. The appellants also contend that this case differs from *Conroy v. Marquette University*, 220 Wis. 2d 81, 582 N.W.2d 126 (Ct. App. 1998). In *Conroy*, this court refused to impose liability on Marquette University when an expelled student attacked a fellow student with a broken bottle at an off-campus nightclub the night after the latter, a resident assistant, had checked the student out of her dormitory room. In that case, the appellants remind us, we pointed to the remoteness in time and the fact that Marquette University had no control over the "operative circumstances" of the attack in holding that public policy precluded liability. *Id.* at 88. In this case, by contrast, the attack occurred the same evening, and Harold participated in not only setting up and choosing the location of the meeting, but covering up the fact that David was present and hiding, listening as Kim discussed intimate details of the couple's relationship. The appellants state, "In *Conroy*, Marquette controlled *none* of the operative circumstances ... [whereas] [i]n this case, Harold controlled almost all of the operative circumstances .... "

¶ 20. We reject the appellants' attempt to distinguish these three cases. First, even if we indulge their assumption that *Gritzner* and *Kelli T-G.* would have come out differently had the perpetrators of the sexual abuse expressed interest in their particular victims, the facts of those cases are distinguishable. In those cases, the defendants knew that the perpetrators had a propensity for molesting children. Here, Harold knew just the opposite: that his brother was all mouth and no action. Second, with respect to *Conroy*, the court's discussion of the temporal remoteness and lack of

control over the "operative circumstances" of the attack only explained why the remoteness of the injury from Marquette's negligence should allow Marquette to escape liability. Even if we agreed with the appellants that the injury here is not too remote from Harold's negligence, we have already stated above that we need only find that *one* of the six policy considerations applies. *See Gritzner*, 235 Wis. 2d 781, ¶ 27. We have discussed several.

¶ 21. Although the parties have stipulated that Harold acted negligently, we hold that public policy considerations preclude holding him liable for Kim's death. It is unreasonable to expect people in Harold's position to attempt to predict erratic and irrational human behavior. Moreover, Kim's death is a result wholly out of proportion to Harold's culpability. We affirm.

*By the Court.*—Judgment affirmed.