# COURT OF APPEALS
## DECISION
## DATED AND FILED

## June 24, 2026

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2024AP1209**

STATE OF WISCONSIN

Cir. Ct. No. 2023PR87

IN COURT OF APPEALS
DISTRICT II

IN THE MATTER OF THE AMENDED AND RESTATED FLORENCE M. BALL REVOCABLE TRUST:

DOMINIC CLARK,

APPELLANT,

V.

THE AMENDED AND RESTATED FLORENCE M. BALL REVOCABLE TRUST AND TRUSTEE OF BALL REVOCABLE TRUST MAUREEN O'LEARY,

RESPONDENTS.

APPEAL from an order of the circuit court for Ozaukee County: SANDY A. WILLIAMS, Judge. *Reversed and cause remanded for further proceedings.*

Before Gundrum, Grogan, and Lazar, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1 PER CURIAM. Dominic Clark appeals an order denying his motion for summary judgment and granting The Amended and Restated Florence M. Ball Revocable Trust and its trustee, Maureen O'Leary's (together the "Trust Litigants"), motion for summary judgment. The order also denied the parties' respective requests for attorney's fees and costs. We agree with Clark that he is entitled to summary judgment on his claim that O'Leary was not a duly appointed Successor Trustee and therefore lacked authority to sell the Trust's real property that is at issue on appeal. We therefore reverse and remand to the circuit court for further proceedings to enter summary judgment on Clark's behalf and to reconsider the parties' requests for attorney's fees and costs.

## BACKGROUND

¶2 In July 2023, the Trust Litigants invoked the circuit court's jurisdiction over trust administration pursuant to WIS. STAT. § 701.0201(1) (2023-24),[1] seeking confirmation that O'Leary had authority to sell the property at issue, either as Successor Trustee or Administrative Trustee, and that a $1,000 distribution to Clark satisfied his beneficial interest in the Trust. The distribution had been made pursuant to the following provision in the revocable trust document (the "Trust"):

> If the residence located at 3921 River Lane, in Brown Deer, Wisconsin is held by or added to this Trust upon the Grantor's death, then it shall be distributed to Dominic Clark, along with any washing machine, dryer, and

---

[1] All subsequent references to the Wisconsin Statutes are to the 2023-24 version.

> refrigerator therein. If that residence is not held by the
> Trust, Dominic shall instead receive $1,000.

The remainder of the Trust was to be distributed to various individuals and charities.

¶3 The Trust's Grantor, Florence Ball, was Clark's aunt. Ball established the Trust in 2008 and amended it on several occasions, including most recently in June 2019. O'Leary's law firm drafted the June 2019 amendments, and in conjunction with those amendments, Ball met with Attorney T. Samuel Azinger, an attorney with O'Leary's law firm. The Trust Litigants' Verified Petition reflects that Ball specifically discussed the above provision regarding the Brown Deer home with Azinger, including whether to alter the bequest. Ball ultimately approved the provision regarding the Brown Deer house, and she executed a Warranty Deed transferring title of the home to the Trust on June 24, 2019. The Verified Petition further reflects that Ball indicated to Azinger that "she would just as well sell the house if she's not living in it" and that she understood that if that occurred, Clark would not receive the home. Prior iterations of Ball's estate planning documents similarly included a bequest of the Brown Deer residence to Clark.

¶4 The Trust additionally sets forth the following relevant provisions. First, Ball reserved certain exclusive rights regarding tangible property and real estate:

> Notwithstanding any other provisions of this Trust, the Grantor reserves the *exclusive right* to use, posses, manage, control, and dispose of any tangible personal property and any real estate used by the Grantor at a residence held by this Trust during the Grantor's lifetime.

(Emphasis added.) Next, the Trust provides for the appointment of successor trustees. As relevant here:

> Maureen L. O'Leary shall be appointed as successor Trustee in the event of the death, resignation, *or inability to act* of the Original Trustee without a successor having been appointed as provided herein. If Maureen is *also unable or unwilling to act* as successor Trustee, or resigns as Trustee, then an individual or corporate Trustee to be selected by the then-acting president of Willms-O'Leary, S.C. (or its successors) shall be appointed as Trustee.

(Emphases added.) The Trust also authorized Ball to appoint an Administrative Trustee, and Ball signed an "Appointment of Administrative Trustee For The Florence M. Ball Revocable Trust" document appointing O'Leary's firm as Administrative Trustee on June 24, 2019, effective immediately, in conjunction with the Trust's signing. Pursuant to the Trust, the Administrative Trustee's powers included the ability "[t]o sell and convey, lease or mortgage any or all real and personal property, and to execute deeds, mortgages, leases, … notes, contracts or other such instruments and agreements[.]"

¶5 While the Trust does not define the phrase "inability to act" for purposes of the successor trustee provision, it does define the related phrase "unable to act." Specifically:

> A person shall be considered to be "disabled," "incapacitated," "unable to act," "unable to manage assets," "unable to manage his or her property," and/or "unable to receive notice" during any period of time that any of the following exist:
>
> 1. A court order is outstanding that finds that person to be legally incapacitated to act in his or her own behalf, or that appoints a guardian to act on his or her behalf;
>
> 2. Two written certificates by licensed physicians that certify each of the following to be true:

a) That the physician is duly licensed and certified by a recognized medical board;

b) That the physician has examined the person; and

c) That based upon said examination the physician has concluded that, by reason of accident, physical or mental illness, illegal drug or alcohol or other substance abuse, progressive or intermittent physical or mental deterioration, or other similar cause, the person examined, on the date of the examination, was not fully capable of managing his or her financial or legal affairs or the affairs of this Trust or any trust created hereunder[.]

(Formatting altered.)

¶6      In August 2021, two years after the most recent Trust amendments, Ball sustained multiple injuries and broken bones in a fall.  Shortly thereafter, Ball's sister contacted O'Leary's law firm and provided a photograph of a "Power of Attorney for Health Care Statement of Incapacity" (the Statement of Incapacity) signed by a psychologist on August 12, 2021, and by a physician on August 13, 2021.[2]  The form states Ball met "the statutory definition of incapacity"; however, that statement was limited to her incapacity "to manage … her health care decisions."  The Trust Litigants do not dispute that this document does not include the statements required to meet the Trust's definition of "unable to act" or "incapacitated" as set forth above.  Nevertheless, O'Leary, apparently relying on

---

[2] In the Verified Petition, the Trust Litigants assert that "two doctors signed [the] healthcare statement of incapacity using an Aurora Health Care form[.]"  While the psychologist's signature indicates a "PsyD" degree—Doctor of Psychology—there is no indication in the Record that would support a conclusion that this individual was a licensed *physician*.

5

the August 2021 psychologist and physician signatures, thereafter began acting as Successor Trustee.

¶7 At least as of April 2022, O'Leary began exploring whether to sell Ball's Brown Deer residence, and she ultimately moved forward with doing so in September 2022. O'Leary's decision followed receipt of a letter in August 2022 wherein a health care provider signed a letter noting Ball "has many chronic medical conditions which are progressive in nature[,]" explained the "medical conditions" required 24-hour care, and that it was in Ball's "best interest" to remain in out-of-home care as returning to her own home "would be unsafe and detrimental to [her] health" because "her care needs exceed what home services could provide."

¶8 It does not appear O'Leary spoke with Ball prior to listing the Brown Deer residence for sale. Rather, it appears Ball inadvertently discovered the pending sale after Clark informed her he had driven past the home and saw the "for sale" sign in the yard. According to Clark, Ball was "upset and confused" as to "why and how her house was being sold." With Clark's assistance, Ball unsuccessfully reached out to speak with O'Leary, who did not return her phone call, to protest the sale. Likewise, when Clark went to O'Leary's office with a letter purportedly bearing both Ball's and a witness's signature that requested

copies of Ball's estate planning documents, O'Leary and/or members of her firm refused to provide Clark with copies.[3]

¶9    O'Leary proceeded with the sale.  Prior to closing, her firm provided the title company with documents purportedly establishing she had authority to sell the residence as Successor Trustee and included the August 2021 Statement of Incapacity the physician and psychologist had signed.  In response, the title company explained it required additional information regarding "what is needed to determine what happens when Florence can't act" such as a "trust cert[ificate] naming [O'Leary] as the acting trustee or … the pertinent pages [of the] trust agreement that state how the successor trustee comes to be the acting trustee." The title company also noted the Statement of Incapacity was insufficient because it "specifically states on it that it is for Power of Attorney for Health Care, [which] has nothing to do with the Trust and can't be used for real property."

¶10    O'Leary's firm subsequently provided a new "Certificate of Trustee Authority" indicating O'Leary, inter alia, had "been acting as Administrative Trustee" since June 2019 and "became Trustee" "due to the inability to act of Florence M. Ball," and the document also included certain Trust provisions regarding trustees.  This "Certificate of Trustee" also referenced the same August 2021 Statement of Incapacity the title company had already explained did not apply for purposes of real property to establish Ball had been "deemed

---

[3] The Verified Petition asserts that while Clark waited in the firm's lobby, O'Leary contacted Ball's sister, who was her "authorized healthcare and financial power of attorney agent," and that the sister "authorized [O'Leary] to inform Clark … Ball had been declared incapacitated by her doctors."  Accordingly, O'Leary and/or members of her firm informed Clark that Ball's power of attorney—her sister—must sign any request for Ball's estate planning documents.

incapacitated upon personal examination by two physicians" in August 2021. The title company thereafter prepared sale documents identifying O'Leary only in her capacity as Successor Trustee. Whether the title company would have authorized O'Leary to proceed with the sale solely in her capacity as Administrative Trustee is unknown.

¶11 O'Leary ultimately signed a Trustee's Deed for the sale of the Brown Deer residence on October 20, 2022, solely in her purported capacity as Successor Trustee. Ball passed away approximately six weeks later. Following Ball's passing, the Trust Litigants sent Clark a check for $1,000 to satisfy his bequest under the Trust since the Trust no longer owned the Brown Deer residence, and at least as of the time he filed this appeal, Clark had not cashed the check.

¶12 The Trust Litigants filed the Verified Petition seeking: (1) a determination that O'Leary had authority to sell the Brown Deer residence as Successor Trustee, Administrative Trustee, and/or that "the sale was appropriate given the facts and circumstances"; and (2) declaratory judgment that Clark was only entitled to $1,000 pursuant to the Trust's terms. Clark filed an objection and Verified Cross-Trust Petition, which sought declaratory judgment that O'Leary was *not* the Successor Trustee under the Trust's terms and therefore had no authority to sell the Brown Deer residence in that capacity, as well as that O'Leary did not sell the residence in her capacity as Administrative Trustee.[4] Clark also

---

[4] Clark alternatively sought declaratory judgment that any purported authority for the Administrative Trustee to sell the residence was void *ab initio*.

sought declaratory judgment that in selling the Brown Deer residence, O'Leary breached her fiduciary duties.

¶13 The parties filed cross-motions for summary judgment. In essence, and as relevant, the parties' respective arguments relate to whether O'Leary was the Successor Trustee under the Trust's terms, whether she had authority to sell the Brown Deer residence as either Successor Trustee or Administrative Trustee, and whether the $1,000 check satisfied Ball's bequest to Clark pursuant to the Trust's terms.

¶14 The Trust Litigants asserted that O'Leary had authority to sell Ball's residence as both Administrative Trustee and Successor Trustee. As to O'Leary's authority as Successor Trustee, the Trust Litigants pointed to the Trust's provision identifying O'Leary as Successor Trustee "in the event of [Ball's] death, resignation, or inability to act" and going so far as to state "[t]here is no question" regarding "Ball's 'inability to act'" under the Trust's terms. In doing so, the Trust Litigants disputed Clark's contention that the Trust's definition of "unable to act"—the requirements of which are set forth above—applies to the phrase "inability to act" for purposes of triggering the successor trustee provision and that in drafting the Trust, the O'Leary firm *intentionally* chose not to define "inability to act." According to the Trust Litigants, the phrase "inability to act" is unambiguous and therefore "no additional documentation [was] necessary" to establish Ball's "inability to act."

¶15 Clark, to the contrary, pointed to the similar dictionary definitions for "inability" and "unable" to support his premise that "inability to act" and "unable to act" should be construed the same way and that because the conditions for establishing Ball was "unable to act" had not been met, there likewise was no

"inability to act" for purposes of the successor trustee provision. Thus, he argued, the successor trustee provision had not been triggered because the August 2021 Statement of Incapacity did not contain the two required licensed physician signatures, and, moreover, neither that document nor the August 2022 letter indicating it would be contrary to Ball's best interests to return home contained the required declarations set forth in the Trust. He also disputed the Trust Litigants' contention that Ball had been declared incapacitated, again pointing to the Trust's definition and the inability of any of the purported medical professionals' signatures to fulfill the definition's requirements. Clark also argued that because O'Leary signed the sale documents as Successor Trustee, the fact that she was also the Administrative Trustee was irrelevant because she did not sign the sale documents in that capacity.

¶16 The circuit court held a motion hearing in April 2024 and ruled in the Trust Litigants' favor. Specifically, the court rejected the Trust Litigants' contention that O'Leary was Successor Trustee, stating it could not so find "because clearly there was no indication of Ms. Ball's incapacity for purposes of Successor Trustee" and suggested perhaps there had been "[a] misinterpretation of the healthcare or information from Ms. Ball's sister as the power of attorney where it was thought that she was incapacitated for purposes of Ms. O'Leary becoming Successor Trustee[.]" However, the court concluded O'Leary nevertheless had authority to sell Ball's Brown Deer residence as Administrative Trustee and likened O'Leary's designation as Successor Trustee on the deed and sale documents to a scrivener's error. In light of this conclusion, the court further determined Clark was entitled only to $1,000 under the Trust's terms because the Trust no longer owned the residence. The court also stated "[t]here was no indication of anything but good faith in terms of" O'Leary having sold the

10

residence under her authority as Administrative Trustee. Finally, the court denied costs to both parties, explaining that while it did not "see a problem with the challenge" asserted, "when people make a challenge[,] they also know that there's a cost to it." The court thereafter signed a written order memorializing its ruling. Clark appeals.

## STANDARD OF REVIEW

¶17 We review a grant of summary judgment de novo. *Estate of Paswaters v. American Fam. Mut. Ins. Co.*, 2004 WI App 233, ¶13, 277 Wis. 2d 549, 692 N.W.2d 299. Summary judgment is appropriate when the moving party is entitled to judgment as a matter of law and no genuine issue of material fact exists. WIS. STAT. § 802.08(2). "At the summary judgment stage, all facts and reasonable inferences" from those facts are "viewed in the light most favorable to the nonmoving party[.]" *Bohm v. Leiber*, 2020 WI App 52, ¶8, 393 Wis. 2d 757, 948 N.W.2d 370.

¶18 The interpretation of a testamentary document presents a question of law we review de novo. *See Furmanski v. Furmanski*, 196 Wis. 2d 210, 214, 538 N.W.2d 566 (Ct. App. 1995). "The paramount object of will or trust construction is the ascertainment of the testator's or settlor's intent," *id.* at 215, and "[t]he best evidence of the testator's intent is the language of the document itself," *MacLeish v. Boardman & Clark LLP*, 2019 WI 31, ¶52, 386 Wis. 2d 50, 924 N.W.2d 799. "If there is no ambiguity in the document, there is no need for us to look further as to what may have been the testator's or settlor's actual intent." *Furmanski*, 196 Wis. 2d at 215.

¶19 A circuit court's decision to impose costs and fees, including reasonable attorney's fees, under WIS. STAT. § 701.1004(1) is discretionary. We

11

review such discretionary decisions under the erroneous exercise of discretion standard. *See Madison Metro. Sch. Dist. v. Circuit Ct. for Dane Cnty.*, 2011 WI 72, ¶34, 336 Wis. 2d 95, 800 N.W.2d 442. "A circuit court properly exercises its discretion when it examines the relevant facts, applies a proper standard of law, and using a demonstrated rational process reaches a conclusion that a reasonable judge could reach." *Dane County DHS v. Mable K.*, 2013 WI 28, ¶39, 346 Wis. 2d 396, 828 N.W.2d 198; *Hartung v. Hartung*, 102 Wis. 2d 58, 66, 306 N.W.2d 16 (1981). "[A] discretionary determination must be the product of a rational mental process by which the facts of record and law relied upon are stated and are considered together for the purpose of achieving a reasoned and reasonable determination." *Hartung*, 102 Wis. 2d at 66. We review questions of law de novo. *Mable K.*, 346 Wis. 2d 396, ¶39.

## DISCUSSION

¶20 The primary issue raised on appeal is whether O'Leary was a duly appointed Successor Trustee under the Trust's terms such that she had authority to sell Ball's Brown Deer residence as Successor Trustee. If she did not have such authority, we must also determine whether O'Leary nevertheless had authority to sell the residence in her capacity as Administrative Trustee despite having signed all relevant sale documents in her purported capacity as Successor Trustee. On appeal, the parties generally raise the same arguments as those raised on summary judgment before the circuit court, and we do not repeat them here.

¶21 We look to the Trust's terms to determine whether O'Leary had authority to act as Successor Trustee when she sold the Brown Deer residence. *See, e.g.*, *McGuire v. McGuire*, 2003 WI App 44, ¶10, 260 Wis. 2d 815, 660 N.W.2d 380. To do so, we must determine Ball's intent as to the meaning of the

phrase "inability to act" as used in the successor trustee provision. We determine intent "from the language of the document itself, considered in light of the circumstances surrounding the testator or settlor at the time the document was executed." *Furmanski*, 196 Wis. 2d at 215. The Trust's language "is the best evidence of [Ball's] intent." *See id.* If there is no ambiguity, we need look no further. *See id.* A trust's language is ambiguous if it "is subject to two or more reasonable interpretations, either on its face or as applied to the extrinsic facts to which it refers." *Czaplewski v. Shepherd*, 2012 WI App 116, ¶15, 344 Wis. 2d 440, 823 N.W.2d 523.

¶22     Under the Trust's terms, O'Leary was to "be appointed as successor Trustee in the event of the … inability to act of the Original Trustee [Ball] without a successor having been appointed as provided" in the Trust. Although the Trust does not define "inability to act," which the Trust Litigants suggest was intentional, the Trust *does* define "unable to act." Having reviewed the Trust as a whole, we are satisfied that Ball unambiguously intended "inability to act" and "unable to act" to carry the same meaning for the purpose of triggering the successor trustee provision. *See, e.g.*, *Staaben v. Jabs*, 57 Wis. 2d 363, 370, 204 N.W.2d 478 (1973) ("A will is not a phrase or group of phrases, but must be considered as an entire instrument and read as such."); *League of Women Voters v. Madison Cmty. Found.*, 2005 WI App 239, ¶15, 288 Wis. 2d 128, 707 N.W.2d 285 ("Trust instruments are construed using the same principles of construction as wills.").

¶23     The successor trustee provision provides that if no other successor trustee has been appointed, O'Leary "shall be appointed as successor Trustee in the event of [Ball's] death, resignation, or inability to act[.]" The sentence immediately thereafter identifies how a successor trustee will be appointed if

O'Leary "is *also unable* or unwilling *to act*[.]" (Emphases added.) The Trust's use of the world "also" clearly indicates Ball intended the nearly identical phrases "inability to act" and "unable to act" to carry the same meaning within this provision. To conclude otherwise would lead to a result wherein the circumstances in which O'Leary was considered "unable to act" within the Trust's definition of that phrase would be far more limited than the circumstances in which Ball herself would be determined to have an "inability to act." Ball cannot have intended for the successor trustee provision to be triggered more readily for the purpose of appointing a successor due to her *own* "inability to act" than in the event O'Leary, too, was "unable to act."[5]

¶24 O'Leary's own understanding—particularly given her firm's involvement in drafting the Trust documents—that Ball's incapacity would trigger the successor trustee provision further indicates Ball did not intend "inability to act" to mean something different than "unable to act." Specifically, the Trust Litigants assert O'Leary understood the August 2021 Statement of Incapacity as being "the triggering event as [appointing O'Leary] Successor Trustee[.]"

---

[5] In the context of contract interpretation, which also seeks to discern the parties' intent, "[w]e interpret the language 'consistent with what a reasonable person would understand the words to mean under the circumstances.'" *Maryland Arms Ltd. P'Ship v. Connell*, 2010 WI 64, ¶¶22-23, 326 Wis. 2d 300, 786 N.W.2d 15. Applying that principle here, a reasonable person would understand "inability to act" and "unable to act" to carry the same meaning. For example, The Oxford English Dictionary defines "inability" as "[t]he state or condition of being *unable* to do something; lack of physical, mental, or moral ability; want of power, capability, or means." *See Inability*, Oxford English Dictionary, https://www.oed.com/dictionary/inability_n?tab=meaning_and_use#742947 (last visited May 29, 2026) (emphasis added; second definition). Likewise, the Oxford English Dictionary defines "unable" as "[n]ot able, not having *ability* or power, *to* do or perform (undergo or experience) something specified." *See Unable*, Oxford English Dictionary, https://www.oed.com/dictionary/unable_adj?tab=meaning_and_use#17141443 (last visited May 29, 2026) (first emphasis added; first definition). From these definitions, it is clear that "inability," a noun, and "unable," an adjective, are simply different parts of speech that a reasonable individual would understand to mean the same thing.

Because "incapacity" *itself* is not identified as a standalone triggering event for purposes of the trustee successor provision, the only way the Statement of Incapacity could serve as a triggering event was pursuant to the definition of "unable to act," which can be established by written certifications from two "licensed physicians" confirming specified facts regarding Ball's inability to undertake certain actions.[6]

¶25    Based on our conclusion that Ball intended "inability to act" and "unable to act" to carry the same meaning for purposes of triggering the successor trustee provision, it is clear the requisite conditions for triggering O'Leary's appointment as Successor Trustee had not been met. First, it is undisputed that Ball had neither passed away nor resigned at the time O'Leary sold the residence. Second, the conditions for establishing an "inability to act"—either a court order or statements from two licensed physicians meeting the requirements explicitly set forth under the Trust's terms—had likewise not been met. Consequently, O'Leary was not the duly appointed Successor Trustee under the Trust's terms, and she therefore lacked authority to sell the Brown Deer residence in such capacity.

¶26    Having determined O'Leary lacked authority to sell the Brown Deer residence as Successor Trustee, we must next determine whether she nevertheless can be considered to have authorized the sale as Administrative Trustee under these circumstances. We conclude she cannot.

---

[6] That O'Leary relied on the August 2021 Statement of Incapacity as the triggering event belies the Trust Litigants' argument that "inability to act" was intentionally undefined. Moreover, the Trust sets forth the same definition for "incapacitated" and "unable to act."

¶27 WISCONSIN STAT. § 706.03(1m) requires that an individual acting as the agent of another must be authorized to do so: "A conveyance signed by one purporting to act as agent for another shall be ineffective as against the purported principal unless such agent was expressly authorized, and unless the authorizing principal is identified as such in the conveyance or in the form of signature or acknowledgment." Because O'Leary signed the sale documents as Successor Trustee without authority to do so and the circumstances set forth in WIS. STAT. § 706.04 that would allow for equitable relief are not present, the conveyance is invalid. *See* WIS. STAT. §§ 706.001, 706.02(1), 706.03(1m); *see also **Lucareli v. Lucareli***, 2000 WI App 133, ¶15, 237 Wis. 2d 487, 614 N.W.2d 60. Consequently, that O'Leary was the Administrative Trustee and may have otherwise had authority to sell the residence in that capacity does not save the transaction here because she did not purport to sell the residence in her capacity as Administrative Trustee. The circuit court therefore erred in equating O'Leary's having signed the deed and sale documents in her capacity as Successor Trustee to a scrivener's error[7] as this was not merely an error or an oversight but rather an intentional representation that O'Leary had authority to act as the Successor Trustee as indicated on the conveyance documents.

¶28 As a final matter, we address the circuit court's denial of the parties' respective requests for costs and fees. It appears the court denied the parties'

---

[7] BLACK'S LAW DICTIONARY explains that a "scrivener's error" or "clerical error" is "[a]n error resulting from a minor mistake or inadvertence" such as "a drafter's or typist's technical error that can be rectified without serious doubt about the correct reading." *See Error*, BLACK'S LAW DICTIONARY (12th ed. 2024) (second definition (clerical error)). More specifically, BLACK'S LAW DICTIONARY provides the following "numberless possible examples" of what might qualify as a scrivener's error: "omitting an appendix from a document; typing an incorrect number; mistranscribing or omitting an obviously needed word; and failing to log a call." ***Id.***

requests based on its conclusion that O'Leary had authority to sell the Brown Deer residence in her capacity as Administrative Trustee despite having signed the sale conveyance documents under the representation she was doing so with authority as Successor Trustee. Because O'Leary's authority as Administrative Trustee was insufficient to do so under the circumstances present here and Clark, rather than the Trust Litigants, is entitled to summary judgment, we believe it is necessary to remand this issue to the circuit court for further consideration of the parties' requests for costs and fees in light of our conclusions as set forth herein. Accordingly, on remand, the circuit court is to enter summary judgment in Clark's favor and reconsider whether to award any of the requested costs and fees.

*By the Court.*—Order reversed and cause remanded for further proceedings.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.